Margaret K. Pfeiffer (MP4552)
Rita M. Carrier (RC3847)
1701 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Tel.:  (202) 956-7500
Fax:  (202) 293-6330

*Attorneys for Defendants/Counterclaimants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

|  |  |  |
|---|---|---|
| BARBARA BROUGHEL, | : | |
| | : | |
| Plaintiff, | : | No. 07 Civ. 7755 (GBD) |
| | : | |
| v. | : | ECF Case |
| | : | |
| | : | ANSWER AND COUNTERCLAIM |
| THE BATTERY CONSERVANCY | : | |
| AND WARRIE PRICE, | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

---------------------------------------------------------- x

Defendants, The Battery Conservancy (the "Conservancy") and Ms. Warrie Price, through their undersigned counsel, state as follows for their answers, defenses, and counterclaim to Plaintiff's Complaint.

1.    To the extent that Paragraph 1 purports to state conclusions of law, no response is appropriate or required.  Defendants deny the averments of Paragraph 1, except admit that the Plaintiff, Ms. Broughel, was notified by letter dated April 5, 2004, that she had been selected through a competition to be a part of the design team for the Conservancy's project to construct an aquatic-themed rideable carousel in Battery Park (the "Project"), and aver that the scope of her participation on the team was to design rideable carousel figures.  Defendants further admit that Ms. Broughel makes the stated claims.

2.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 2.

3.      Defendants admit the averments of Paragraph 3.

4.      Defendants admit that Ms. Warrie Price is the founder of the Conservancy, and that she serves as its President, as the Battery Administrator for the New York City Department of Parks & Recreation, and as the New York State Heritage Area Director.  The second sentence of Paragraph 4 purports to state a conclusion of law to which no response is appropriate or required.

5.      To the extent that Paragraph 5 purports to state conclusions of law, no response is appropriate or required.  Defendants deny that Ms. Broughel has stated a claim that jurisdiction lies under 28 U.S.C.  § 1338(b) because the Complaint states no claim for unfair competition, and further deny that the amount in controversy exceeds $75,000.00 because the only amount that Ms. Broughel has claimed from the Conservancy is for costs and expenses of $2,250.85, while the Conservancy has claims against Ms. Broughel for $20,000.00.

6.      To the extent that Paragraph 6 purports to state conclusions of law, no response is appropriate or required.  Defendants nevertheless admit that they are located in New York and that the alleged conduct took place, in whole or in part, in New York, making Defendants subject to the jurisdiction of this Court.

7.      To the extent that Paragraph 7 purports to state conclusions of law, no response is appropriate or required.  Defendants nevertheless admit that the Conservancy's principal place of business is in New York, that Ms. Price resides in New York, and that a substantial part of the events giving rise to Ms. Broughel's claims occurred in New York, making this District a proper venue for this action.

8.    Defendants deny the averments of Paragraph 8, except admit that the Conservancy issued a "Call to Artists" on or about January 5, 2004, seeking to commission an artist or a team of artists to design and participate in the fabrication and installation of rideable aquatic figures for a carousel being designed by the architectural firm Weisz + Yoes (the "Architect"), with the selected artist to participate as part of the design team for the Project, and that artists were requested to respond by January 26, 2004, by submitting examples of prior works.  Defendants aver that the Conservancy agreed to pay an honorarium of $1,000.00 to each of the five finalists upon submission of their proposals (Call to Artists, at second page), and that Ms. Broughel was paid the $1,000.00 honorarium as agreed. (The Call to Artists is attached as Exhibit 1 to Defendants' Counterclaim.)  Defendants refer to the Call to Artists for a complete and accurate statement of its contents.

9.    Defendants deny the averments of Paragraph 9, except admit that Ms. Broughel was selected as a finalist, and aver that, on February 2, 2004, the Conservancy provided a Finalist's Proposal Package containing, *inter alia*, "The Battery Conservancy Marine Life Carousel Figures Artist Orientation Outline" (the "Orientation Outline") to Ms. Broughel and to two other individuals and two teams that had responded to the Call to Artists, inviting them to submit a visual depiction of their concepts including several carousel figures and the placement of the figures in the carousel, a written description of their approach to the Project, resumes, and a small scale model of one carousel figure.  (Orientation Outline, at 4.)  (The Orientation Outline is attached as Exhibit 2 to Defendants' Counterclaim.)  Defendants further aver that the Orientation Outline set out the artist's budget for the design of the figures, which, far from being "open-ended" as averred in Paragraph 9, was stated to be "up to $50,000 depending on the final scope of work," which specifically included all of the following:  "Artist

Fee; Office/Studio expenses and labor related to this project; Presentation drawings and models as required for approvals and fundraising; Working drawings, models, templates and prototypes as required for fabrication; Artist's Travel; Shipping of working drawings, models or prototypes to fabricator; [and] All Risk Art Insurance." (*Id*. at 3.)  Defendants refer to the Orientation Outline for a complete and accurate statement of its contents.

10.    Defendants deny the averments of Paragraph 10, except admit that Ms. Broughel was awarded a position on the design team of the Project, based principally on a model of a fish made of translucent cast resin as suggested in the Orientation Outline (the "Fish Model") (*id*. at 2), and a "script" likening the carousel experience to swimming underwater.

11.    Defendants deny the averments of Paragraph 11.

12.    Defendants deny the averments of Paragraph 12, except admit that, in connection with the Conservancy's 2004 annual benefit, Ms. Broughel provided a duplicate of the Fish Model.  Defendants aver that, also in connection with the Conservancy's 2004 annual benefit, Ms. Broughel allowed the Conservancy to reproduce watercolor paintings that she had made and to distribute these reproductions at the annual benefit, which Ms. Broughel attended. Defendants further aver that, in responding to the Orientation Outline, Ms. Broughel agreed to provide "one life-size figure" for the annual benefit (*id*. at 5), and that the duplicate of the Fish Model did not have the same qualities as the original Fish Model for which Ms. Broughel was awarded the position on the design team.  Defendants also aver that Ms. Broughel, by responding to the Orientation Outline, also agreed to provide "Presentation drawings and models as required for approvals and fundraising" (*id*. at 3), but that she retained possession of the watercolor paintings, that she subsequently displayed the watercolor paintings in a gallery where they were put on sale, and that at least one was purchased for her benefit.  Defendants further aver that it is

4

public knowledge that the Conservancy's annual benefit has always raised money for operating costs of the Conservancy, and that it has been the practice of artists and vendors to donate their services, in whole or in part, for the purposes of the benefit.  Defendants also aver that despite this practice and in view of the need to maintain a good working relationship with Ms. Broughel, on or about July 19, 2004, the Conservancy paid, and Ms. Broughel accepted, an honorarium of $5,000.00 as payment in full for the duplicate of the Fish Model and the use of the watercolor paintings.

13.    Defendants deny the averments of Paragraph 13, except admit, upon information and belief, that on January 20, 2006, Ms. Broughel entered into a contract with the Architect, and aver that the contract between the Architect and Ms. Broughel (the "W+Y Contract") did not contain the language "species selection," and further aver that the W+Y Contract contained a Phase II which required that Ms. Broughel "Document Design of Overall Figures and Individual Figure Details for Budget/Bid Pricing." (W+Y Contact, at 2.)  (The W+Y Contract is attached as Exhibit 3 to Defendants' Counterclaim.)  Defendants refer to the W+Y Contract for a complete and accurate statement of its contents

14.    Defendants deny the averments of Paragraph 14, and deny knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 14 that pertain to the W+Y Contract, and aver, upon information and belief, that Ms. Broughel failed to perform in a timely manner, failed adequately to perform Phase I of the W+Y Contract, and never performed Phase II.  Defendants also aver, upon information and belief, that by February 2006, it had become apparent to the Architect that Ms. Broughel would not produce the detailed drawings required by the fabricator to proceed with the Project, and that, on March 16, 2006, the Architect informed the Conservancy that it had terminated Ms. Broughel through a  March 15,

2006 e-mail stating "[w]e have been informed by PRG [the fabricator], that in order to make the April 25th deadline, your work with them is finished. . . . We consider your work on the project finished.  Thank you for your participation in the project."

       15.     Defendants deny the averments of Paragraph 15 to the extent they refer to Ms. Price, and deny, upon information and belief, the averments to the extent they refer to the Architect.

       16.     Defendants deny the averments of Paragraph 16, and aver that Ms. Price made every effort to soothe Ms. Broughel's ego in an attempt to persuade her to work cooperatively with the design team.

       17.     Defendants deny the averments of Paragraph 17.

       18.     Defendants deny the averments of Paragraph 18, and aver that, with the exception of the Fish Model, none of the work created by Ms. Broughel was used for any approval or permitting process.  Defendants further aver that, in any event, in responding to the Orientation Outline, Ms. Broughel agreed to provide "Presentation drawings and models as required for approvals and fundraising." (Orientation Outline, at 3.)

       19.     Defendants deny the averments of Paragraph 19, except aver, upon information and belief, that Phase I of the W+Y Contract required Ms. Broughel to provide designs for all of the carousel figures that met code rideabilty requirements, and that she failed to produce these designs.

       20.     Defendants deny the averments of Paragraph 20, except aver that Ms. Broughel repeatedly sent revised budgets and timelines in a pattern of increasing costs and delay. Defendants further aver that the Conservancy had no contract with Ms. Broughel in January or

April 2006, was not a party to the W+Y Contract, and was under no contractual obligation to pay Ms. Broughel for any services provided under the W+Y Contract.

21.    Defendants deny the averments of Paragraph 21, except aver that, by May 2006, the Conservancy understood that Ms. Broughel had not produced the necessary designs for the individual carousel figures, and entered into negotiations to try to reach an amicable resolution of Ms. Broughel's participation in the Project.  Defendants deny knowledge or information sufficient to form a belief as to the truth of the averments as to why Ms. Broughel rejected the offer.

22.    Defendants deny the averments of Paragraph 22, except admit that in hopes of salvaging the investment made in Ms. Broughel, and relying on representations by Ms. Broughel that she understood the requirements of the designs to be produced and was capable of producing them, the Conservancy and Ms. Broughel entered into a letter contract dated July 12, 2006 (the "Letter Contract"), at which time the Conservancy paid Ms. Broughel $20,000.00 in advance and she agreed to produce, in the near future, "a schematic, scalable design for each of the individual Carousel Figures showing human scale relationship and size . . . [and] indicat[ing] color, scale, and pattern concepts" (which she had failed to do under the W+Y Contract). Defendants aver that Ms. Broughel agreed to direct the production of a full-scale prototype model of half a fish (the "Second Prototype") as a pro-bono, tax deductible contribution to the Conservancy, and aver that Ms. Broughel also agreed to produce on a pro-bono basis 10-12 initial experimental resin samples, at a cost not to exceed $300.00, and that she also agreed that the Conservancy would pay the following estimated costs of the Second Prototype, subject to the Conservancy's securing funding:  modeling ($10,000.00); mold making ($3,000.00-$5,000.00); and casting and armature ($4,500.00).  Defendants refer to the Letter Contract for a complete and

accurate statement of its contents. (The Letter Contract is attached as Exhibit 4 to Defendants' Counterclaim.)

23.    Defendants deny the averments of Paragraph 23, except admit that Ms. Broughel worked on clay fish models and examples of materials of which the "skin" of the carousel figures would be made, and attempted to coordinate production of the Second Prototype with the fabricator, and aver that the production of the chandelier element was covered by a side agreement and was fully performed by both parties.

24.    Defendants deny the averments of Paragraph 24, except admit that, in early 2007, the Conservancy decided not to proceed with the fabrication of the Second Prototype, and aver that the Conservancy reached this decision because it was not confident that Ms. Broughel had produced any materials that would enable the fabricator to produce the Second Prototype.

25.    Defendants deny the averments of Paragraph 25, except admit that, in response to several e-mails in early 2007 from Ms. Broughel requesting that the Conservancy issue her a letter recognizing her pro-bono contribution for 2006, the Conservancy provided her a letter dated February 15, 2007, acknowledging pro-bono work from June 1 to December 31, 2006, in the value of $19,368.00, based upon information provided by Ms. Broughel. Defendants deny knowledge or information sufficient to form a belief as to the truth of whether a tax deduction was permissible under the applicable tax laws.

26.    Defendants deny the averments of Paragraph 26, except admit that the Conservancy, by letter dated March 21, 2007, terminated the Letter Contract with Ms. Broughel due to Ms. Broughel's breach of contract.

27.      Defendants deny the averments of Paragraph 27, except admit that the Conservancy sent a letter to Ms. Broughel on April 12, 2007, explaining its reasons for terminating her, and aver that, on March 5, 2007, Ms. Price had met with Ms. Broughel and had told her that the Conservancy had decided to go forward with the Project without her participation and had urged Ms. Broughel to take her possessions from the Conservancy's offices.  Defendants further aver that, going to great lengths to try to avoid offending Ms. Broughel's ego, Ms. Price, on behalf of the Conservancy, sent a letter dated March 21, 2007, terminating Ms. Broughel without detailing the latter's failures, and that, in response to a letter dated April 6, 2007, from Ms. Broughel, which purported not to understand her termination by the Conservancy, Ms. Price, on behalf of the Conservancy, on April 12, 2007, sent Ms. Broughel a second letter that restated the Conservancy's termination of Ms. Broughel and detailed her failures to perform the services required under the Letter Contract, which formed the grounds for termination.

## CLAIM I

28.      Defendants repeat and incorporate their responses to Paragraphs 1-27.

29.      Defendants deny the averments of Paragraph 29, and aver that the design team of the Project, not including Ms. Broughel, is the author of the bulk of the designs of the Project, except admit that Ms. Broughel created limited conceptual designs for proposed carousel figures.

30.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 30, except admit that Ms. Broughel has attached to the Complaint a copy of a Certificate of Registration dated March 22, 2007.

31.       Defendants deny the averments of Paragraph 31, and aver that none of Ms. Broughel's designs were or could be used in the Project.

32.    Defendants deny the averments of Paragraph 32.

## CLAIM II

33.    Defendants repeat and incorporate their responses to Paragraphs 1-27.

34.    Defendants deny the averments of Paragraph 34, aver that the only contract that existed between the Conservancy and Ms. Broughel was the Letter Contract, and further aver that the Conservancy fully performed its obligations under the Letter Contract by paying Ms. Broughel $20,000.00, and that, because she failed to perform, she was in fact overpaid by $20,000.00.

35.    Defendants deny the averments of Paragraph 35.

36.    Defendants deny the averments of Paragraph 36.

## CLAIM III

37.    Defendants repeat and incorporate their responses to Paragraphs 1-27.

38.    Paragraph 38 purports to state conclusions of law to which no response is appropriate or required.  Defendants deny that the Conservancy ever issued an RFP and that the Orientation Outline constituted a binding contract, and aver that the W+Y Contract, to which the Conservancy was not a party, set out Ms. Broughel's obligations in Phase I.

39.    Defendants deny the averments of Paragraph 39.

40.    Defendants deny the averments of Paragraph 40.

## CLAIM IV

41.    Defendants repeat and incorporate their responses to Paragraphs 1-27.

42.    Defendants deny the averments of Paragraph 42.

43.    Defendants deny the averments of Paragraph 43.

44.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the averment of Paragraph 44, except aver that, in her invoice for recognition of

pro-bono services, Ms. Broughel billed her time at $75.00 per hour. Defendants further aver that on January 10, 2007, Ms. Broughel submitted to the Conservancy a tally of 276.75 hours that she agreed to donate, that she requested an acknowledgment of this time at $75.00 per hour, totaling $20,718.00, and that the Conservancy acknowledged her contribution of $19,368.00 by letter dated February 15, 2007.

45.     Defendants deny the averments of Paragraph 45.

## CLAIM V

46.     Defendants repeat and incorporate their responses to Paragraphs 1-27.

47.     Defendants deny the averments of Paragraph 47.

48.     Defendants deny the averments of Paragraph 48.

49.     Defendants deny the averments of Paragraph 49.

50.     Defendants deny the averments of Paragraph 50.

## CLAIM VI

51.     Defendants repeat and incorporate their responses to Paragraphs 1-27.

52.     Defendants deny the averments of Paragraph 52, and deny knowledge or information sufficient to form a belief as to that which Ms. Broughel understood, and aver that Ms. Broughel received a $1,000.00 honorarium for submitting her proposal in response to the Call to Artists.

53.     Ms. Price denies the averments of Paragraph 53, except admits that she knew that Ms. Broughel was selected as a member of the design team.

54.     Ms. Price denies the averments of Paragraph 54, except admits that she was aware of the contents of the Orientation Outline.

55.     Ms. Price denies the averments of Paragraph 55.

56.     Ms. Price denies the averments of Paragraph 56, and avers that any injury incurred by Ms. Broughel was caused by her own actions, including her breach of both the W+Y Contract and the Letter Contract.

CLAIM VII

57.     Defendants repeat and incorporate their responses to Paragraphs 1-27.

58.     Defendants deny the averments of Paragraph 58, except admit, upon information and belief, that Ms. Broughel had a contract with W+Y of which Ms. Price was aware.

59.     Ms. Price denies the averments of Paragraph 59.

60.     Ms. Price denies the averments of Paragraph 60.

61.     Ms. Price denies the averments of Paragraph 61, and avers that any injury incurred by Ms. Broughel was caused by her own actions, including her breach of both the W+Y Contract and the Letter Contract.

CLAIM VIII

62.     Defendants repeat and incorporate their responses to Paragraphs 1-27.

63.     Defendants deny the averments of Paragraph 63, and aver that the balance of hardships weighs in favor of the continuation of the Project without Ms. Broughel.


Defendants deny that Ms. Broughel is entitled to any relief whatsoever.


**ADDITIONAL AND AFFIRMATIVE DEFENSES**

Defendants assert the following defenses without assuming the burden of proof when the burden of proof would otherwise be on the Plaintiff.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state any claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

With the possible exception of the Fish Model, Ms. Broughel provided no copyrightable work concerning the Project.

## THIRD AFFIRMATIVE DEFENSE

Defendants have not created any derivative works from Ms. Broughel's work.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's inability and failure to perform the contracted-for services, and not any conduct or act of Defendants, have been the direct or proximate cause of any injury that Plaintiff has sustained.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff is estopped from recovery due to her own conduct and actions, including, without limitation, her breach of contract.

## SIXTH AFFIRMATIVE DEFENSE

The claims asserted in Plaintiff's Complaint are barred by the doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's alleged claims for compensation have been satisfied by accord and satisfaction.

## EIGHTH AFFIRMATIVE DEFENSE

By her own conduct, Plaintiff waived any right to recovery against the Defendants.

<u>NINTH AFFIRMATIVE DEFENSE</u>

Plaintiff's claims against Defendants are barred by her fraudulent representations that she possessed the necessary qualifications and skills to fulfill the requirements of the Project.

<u>TENTH AFFIRMATIVE DEFENSE</u>

Plaintiff is barred from recovery because she has been duly paid for her services.

<u>ELEVENTH AFFIRMATIVE DEFENSE</u>

Plaintiff is barred from asserting a claim in copyright because the Orientation Outline created a license to use the works she produced for the Project for the purposes stated in the Orientation Outline, and she further agreed to the Conservancy's use of the Fish Model and the copies of the watercolor paintings.

<u>TWELFTH AFFIRMATIVE DEFENSE</u>

Plaintiff is barred from asserting a claim of breach of contract or interference with contract due to failure of consideration.

<u>THIRTEENTH AFFIRMATIVE DEFENSE</u>

Plaintiff's claims are barred by acquiescence.

<u>FOURTEENTH AFFIRMATIVE DEFENSE</u>

Plaintiff's claims are barred in whole, or in part, by the Statute of Frauds.

**<u>COUNTERCLAIM</u>**

PARTIES

1.     The Battery Conservancy (the "Conservancy"), Defendant/Counterclaimant, is a 501(c)(3) not-for-profit educational corporation incorporated in the state of New York, with its place of business at 1 New York Plaza, Concourse Level, New

York, New York 10004. The Conservancy's mission is to rebuild and revitalize the Battery, the park at the tip of Manhattan, and the park's major landmark, Castle Clinton National Monument. With public and private support, the Conservancy is rebuilding the park through design excellence and innovation.

2.      Ms. Warrie Price, Defendant/Counterclaimant, is the founder of the Conservancy, and she serves as its President as well as the Battery Administrator for the New York City Department of Parks & Recreation and the New York State Heritage Area Director. She is a resident of, and domiciled in, the state of New York. Ms. Price has built partnerships with city, state, and federal agencies. Ms. Price served for two years on the Manhattan Borough President's Taskforce, and she has served on the board of the Metropolitan Waterfront Alliance and on the board of Scenic Hudson. As chair of Manhattan's Community Board #8, she was instrumental in creating new waterfront access along the East River and worked to renovate six community parks on the Upper East Side.

3.      Upon information and belief, Plaintiff/Counterclaim-Defendant, Barbara Broughel, is a resident of, and domiciled in, the state of Connecticut.

JURISDICTION AND VENUE

4.      If this Court accepts jurisdiction as a matter of federal copyright law under 28 U.S.C. §§ 1331, 1338(a), and supplemental jurisdiction under 28 U.S.C. § 1367, then this Court has jurisdiction over this Counterclaim to the same extent it has jurisdiction over the Complaint.

5.      This Court has personal jurisdiction over Ms. Broughel because the actions and omissions giving rise to this Counterclaim occurred in the state of New York and in this District, and because she has submitted to the jurisdiction of this Court by filing her Complaint.

6.       Venue in this district is proper under 28 U.S.C. § 1391(b)(1) because the Conservancy is situated in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred in this District.

FACTUAL ALLEGATIONS

7.       On or about January 5, 2004, the Conservancy posted on the New York Foundation for the Arts website and four other websites a "Call to Artists" to design rideable carousel figures for the Conservancy's project to construct an aquatic-themed, rideable carousel in Battery Park (the "Project").  The Call to Artists included information concerning the Project, two drawings of the proposed carousel from the architectural firm that had already been retained to design the carousel, Weisz + Yoes (the "Architect"), and examples of the aquatic species that could be represented as carousel figures, and explained that the carousel will feature thirty figures cast in resin, representing a selection of marine life that was displayed in the original Battery Park aquarium.  To be considered for participation in the design team for the Project, the artists were asked to submit, by January 26, 2004, references, resumes, slides of their prior work, and a completed brief questionnaire.  (The Call to Artists is attached as Exhibit 1.)

8.       Of the many artists and teams of artists that responded to the Call to Artists, the Conservancy invited five finalists, three individuals and two teams, to submit formal proposals.  On February 2, 2004, the finalists were given a Finalist's Proposal Package which included, *inter alia*, the "The Battery Conservancy Marine Life Carousel Figures Artist Orientation Outline" (the "Orientation Outline"), as a non-binding guide to the selection process. The Orientation Outline included:  (i) general information on the Battery; (ii) a description of the Project (including the concept that riding the carousel should evoke in the rider a sense of "swimming with the marine life" (Orientation Outline, at 2)); (iii) the scope of the artist's participation (including the recommendation that the figures be made of a translucent cast resin

16

material (*id.*); and (iv) a "budget" specifying that "[t]he artist's budget will be up to $50,000

depending on the final scope of work," (*id.* at 3.). It was further specified that "[t]he artist's

budget will cover: Artist Fee; Office/Studio expenses and labor related to this project;

Presentation drawings and models as required for approvals and fundraising; Working drawings,

models, templates and prototypes as required for fabrication; Artist's Travel; Shipping of

working drawings, models or prototypes to fabricator; [and] All Risk Art Insurance." (*Id.*) The

Orientation Outline also described the artist selection process, listed the eight members of the

selection committee, described what the proposals should contain, and provided information on

contracting. It also stated that the artist would create "one life-size figure" for presentation at the

Conservancy's annual fundraising event, and made the statement that the "carousel fabricator

will be responsible to build and install the carousel." (*Id*. at 5.) The Orientation Outline further

specified that an honorarium of $1,000.00 would be "awarded to the finalists upon submission of

the proposals," and that that amount "must cover all expenses related to the submission including

artists [sic] travel." (*Id.* at 4.) While the "proposal will remain the property of the artist," the

"Conservancy reserves the right to retain the proposal for up to one year for display purposes,

and the right to reproduce it for documentation purposes." (*Id.*) The Finalist's Proposal Package

also included sketches and diagrams of the Battery, a lengthy list of animals to be considered for

the carousel figures, and architectural drawings indicating the recommended size, scale, and

placement of the carousel figures on the carousel platform. (The Finalist's Proposal Package

cover sheet and the Orientation Outline are attached as Exhibit 2.)

   9.  On or about February 12, 2004, Ms. Broughel entered into a "Finalist

Proposal Agreement" whereby she agreed to submit a proposal for the Project and the

Conservancy agreed to pay $1,000.00 for, *inter alia*, "the right to document the proposals and

keep them for display for up to one year."  By entering into this agreement, Ms. Broughel held herself out to the Conservancy as possessing the necessary skills to complete the Project.

10.    On March 23, 2004, Ms. Broughel presented to the selection committee her proposal, which consisted of one model of a fish made of translucent cast resin (the "Fish Model") accompanied by a "script" likening the carousel experience to swimming underwater.

11.    The selection committee chose Ms. Broughel, and sent her notification in an award letter dated April 5, 2004, stating that she was "selected as [sic] to be part of the team for the Battery Carousel project" because her "proposal was the most closely inspired by our original concept of 'swimming with the fishes.'"  The letter went on to state, "Thank you for coming in immediately on Wednesday to begin discussion with us on the next steps to insure that we have a fabulous display for the Gala on June 7.  As we discussed, we'll be following up to develop a firm up [sic] the scope of work and schedule for the first design phase and the future project phases."

12.    On June 7, 2004, the Conservancy hosted its annual fundraising gala, and pursuant to the Orientation Outline, Ms. Broughel reproduced the Fish Model as the required "one life-size figure."  (Orientation Outline, at 5.)  The duplicate of the Fish Model, however, did not have the same qualities as the original for which Ms. Broughel was awarded the position on the design team; it was not as translucent as the original, had a less attractive color and texture, and lacked the sense of movement present in the original.  Ms. Broughel also created a series of watercolor paintings of fish pursuant to the Orientation Outline's requirement that she provide "Presentation drawings and models as required for approvals and fundraising." (*Id*. at 3.)  She, however, retained physical possession of the watercolor paintings, allowing the Conservancy only to make copies of them to be distributed at the annual fundraising gala, which she attended.

She also displayed the watercolor paintings at a gallery, where they were put on sale and at least one of them was sold for her benefit.

13.     Even though it has been the practice of artists and vendors to donate their services, in whole or in part, for the purposes of the Conservancy's annual benefit, which has always raised money for operating costs of the Conservancy, Ms. Broughel surprised the Conservancy by presenting it with a bill of $28,818.00 for the less-than-satisfactory reproduction of the Fish Model and the use of the watercolor paintings, which bill included a "profit margin."

14.     Although the Conservancy had not expected to pay Ms. Broughel for any such expenditures or profit associated with the reproduction of the Fish Model and the creation of the watercolor paintings, on or about July 19, 2004, the Conservancy, recognizing the close working relationship necessary to complete the Project, paid, and Ms. Broughel accepted, an honorarium of $5,000.00 as full compensation for the services that were the subject of her invoice.

15.     On information and belief, there was a lengthy period while Ms. Broughel engaged in contract negotiations with the Architect.  On information and belief, Ms. Broughel caused the formation of a contract to be delayed due to making, through her attorney, unreasonable demands concerning her intellectual property rights and her participation in, and control of, the Project.  On information and belief, Ms. Broughel agreed to contract with the Architect because the Architect headed the design team, and the team members subcontracted with the Architect.

16.     On information and belief, on January 20, 2006, Ms. Broughel entered into a contract with the Architect (the "W+Y Contract") as one of the subcontractors on the Project team.  The W+Y Contract set out tasks in two phases:  under Phase I Ms. Broughel was

required to (1) "Collaborate with Design Team to develop interior design elements of the Carousel"; (2) develop an "Overall Plan for Carousel Figures"; (3) develop a "Design for each of the individual Carousel Figures"; (4) create a "Model of the Carousel + Figures @ small scale (physical model to be produced with Scenic Technologies)"; and (5) develop a "Prototype of one Figure @ full scale (physical model to be produced with Scenic Technologies)." Under Phase II, she was required to "Document Design of Overall Figures and Individual Figure Details for Budget/Bid Pricing." (W+Y Contract, at 2.) (The W+Y Contract is attached as Exhibit 3.)

17.     On information and belief, Ms. Broughel was first to create conceptual designs of all of the carousel figures, with aesthetics similar to the Fish Model she had created for her proposal. She was then to translate the designs into scaled drawings or 3-dimensional models that would indicate how to make rideable figures with enough detailed measurements and dimensions to provide a fabricator (a mold-maker and producer of the actual figures) sufficient information to estimate the amount of work involved in building all of the figures and to build a prototype of one figure (the "Required Designs"). The Required Designs should have set out the form, shape, size, texture, color, and scale of the figures so that their relationship to each other and to the carousel pavilion could be determined, demonstrated how a person would mount, ride, and dismount the figures, and indicated how the figures might move.

18.     On information and belief, Ms. Broughel was paid a total of $18,000.00 in advance by W+Y to perform the Phase I contracted-for services.

19.     On information and belief, Ms. Broughel did not translate her conceptual designs into the Required Designs. For example, on information and belief, on February 17, 2006, the fabricator requested that she provide, *inter alia*, dimensioned scale drawings, cross section drawings, and a scaled "white" model (a working model of a figure to indicate form

made of a plain material and not indicating color or texture). On information and belief, in response, on February 20, 2006, Ms. Broughel contacted the fabricator and stated that she could not provide the requested cross section drawings because she did not know what material she would be using, and that she could not create the required model because she had a broken arm and her assistant had never done that type of work with her before, and she still had "to figure out and acquire materials for the model."

20.     On information and belief, on February 21, 2006, when responding to repeated requests from the Architect and the fabricator for the Required Designs, she stated that she did not know how to use the computer program to make detailed drawings: "I DO NOT CONVERSANT [sic] WITH THE CAD PROGRAM USED TO MAKE THESE. I MAY BE ABLE TO MAKE THEM SOMETHING IN PHOTOSHOP INSTEAD…UNLESS THERE IS SOMEONE THERE (YOURSELF EVEN?) WHO CAN HELP WITH CAD DWGS?" Then, two days later, on February 23, 2006, she admitted that "[t]he drawings I sent . . . do not have width dimensions for the fins or tail."

21.     On information and belief, Ms. Broughel asked the Architect or the fabricator to do research as well as to create drawings for her. On February 23, 2006, she wrote to the fabricator:  "Perhaps [a fabricator employee] can get any code requirements on the materials for handles and stirrups" and also asked that this employee recommend fiber optic materials and "provide some samples of her recommendations."

22.     On information and belief, Ms. Broughel also proved herself to be unreasonably difficult to work with and incapable of working on a team. For example, on a March 8, 2006 conference call with the members of the design team working on the prototype,

the participants agreed that, as is the general practice, all communications with the fabricator would be routed through the Architect in order to prevent confusion.

23.    On information and belief, the Architect determined that it could no longer work with Ms. Broughel, and terminated her services under their contract in an e-mail dated March 15, 2006, stating "[w]e have been informed by PRG [the fabricator], that in order to make the April 25th deadline, your work with them is finished.  For us to make this deadline as well, we must work with the material we have from you to date.  Therefore, please send your final and total fee invoice for the work you have completed.  We consider your work on the project finished.  Thank you for your participation in the project."  On information and belief, on March 15, 2006, Ms. Broughel responded "OK."

24.    On information and belief, on March 26, 2006, Ms. Broughel ignored her termination and sent a letter to the fabricator stating that "I will need to be able to directly communicate with all fabricators and sub-contractors on an as-needed basis."  Despite the statement in the Orientation Outline that the "fabricator will be responsible to build and install the carousel" (Orientation Outline, at 5), Ms. Broughel indicated in the letter that she also needed to "supervise the final installation of the figures and sculptural elements into the carousel."  Even though the fabricator's contract was with the Architect, and Ms. Broughel had agreed that the Architect had terminated her participation in the Project, Ms. Broughel concluded the letter by stating, "[i]f you or your subcontractors cannot meet the minimum requirements I have outlined above, please inform me as soon as it is possible to do so, so that we may move forward in the selection of a suitable working partner on the fabrication of the figures."

25.    On or about March 29, 2006, informed by correspondence received contemporaneously and on information and belief, Ms. Broughel again contacted the fabricator directly by e-mail asking for detailed reports and dictating instructions.

26.    Ms. Price, attempting to keep the Project team from dissolving, allowed Ms. Broughel to continue to provide some materials to the fabricator.  The fabricator attempted to use these materials but the resulting prototype was unsatisfactory, possessing none of the translucency of the Fish Model and having a cartoon-like quality, an attribute specifically discouraged in the Orientation Outline. (*See* Orientation Outline, at 2.)

27.    On information and belief, Ms. Broughel failed adequately to perform Phase I of the W+Y Contract and never performed Phase II.

28.    By agreement dated July 10, 2006, the Conservancy and the Architect acknowledged the severance of Ms. Broughel's relationship with the Architect and agreed that Ms. Broughel would report directly to the Conservancy.

29.    The Conservancy, hoping to salvage the investment made in Ms. Broughel, and relying on representations by Ms. Broughel that she understood the requirements of the designs to be produced and was capable of producing them, entered into a letter contract with Ms. Broughel dated July 12, 2006 (the "Letter Contract"), under which the Conservancy paid Ms. Broughel $20,000.00 in advance as consideration for her agreement to produce, in the near future, "a schematic, scalable design for each of the individual Carousel Figures showing human scale relationship and size . . . [and] indicat[ing] color, scale, and pattern concepts" (which she had failed to do under the W+Y Contract).  Ms. Broughel agreed to direct the production of a full-scale prototype model of half a fish (the "Second Prototype") as a pro-bono, tax deductible contribution to the Conservancy and to produce on a pro-bono basis 10-12 initial

experimental resin samples, at a cost not to exceed $300.00.  Ms. Broughel also agreed that the Conservancy would pay the following estimated costs of the Second Prototype, subject to the Conservancy's securing funding:  modeling ($10,000.00); mold making ($3,000.00-$5,000.00); and casting and armature ($4,500.00).  (The Letter Contract is attached as Exhibit 4.)

30.     In late July 2006, Ms. Broughel produced several resin samples, but by November 2006, the Conservancy had not received any other work product from Ms. Broughel.

31.     The Conservancy made multiple oral and written requests to Ms. Broughel for the designs for the individual carousel figures.  In early November 2006, the Conservancy informed Ms. Broughel that the work she had created thus far was not adequate:  "The photos of the fish you sent [prior to the Letter Contract], while very detailed, do not provide adequate information for us to fabricate the full scale mock up that Warrie has requested."   In late November 2006, the Conservancy still had not received any adequate designs and inquired, "[w]hen will you send us the scaled photos or drawings of all the fish? . . . The design of the figures with the 'rideabilitiness factor' is required as part of the work you are to do."

32.     Rather than providing the "schematic, scalable" designs for each of the individual carousel figures she had agreed to produce under the Letter Contract, Ms. Broughel made thirty-two very small (4 to 10 inch) clay models.  She refused to send the Conservancy the models, and only provided the Conservancy with photographs of them.  The Conservancy suggested that Ms. Broughel produce these models to facilitate her development of the "schematic, scalable" designs, but she never produced any "schematic, scalable" designs.  The photographs of the clay models were not an adequate basis for producing rideable carousel figures; none was properly scaled for the fabricator to use to produce a full-size figure, and the

measurements were inconsistent.  (Photos of the hammerhead shark clay model and smaller clay figures on the carousel platform, with differing measurements, are attached as Exhibits 5 and 6.)

33.    The inadequacy of the photographs and models was demonstrated when, in an effort to determine whether the fabricator could use Ms. Broughel's photographs of the clay models to construct the carousel figures, the Conservancy, without Ms. Broughel's assistance, made full-scale cardboard mock-ups of the figures, using the photographs and scaling them up to produce the mock-ups.  This effort showed that the carousel figures that Ms. Broughel's models would produce were not rideable—a child could not get on, safely ride, or get off the figures because the height and width of the figures were too great; and there were no footholds, handholds, or indications of seatbelts.  Furthermore, the scale of the figures was wrong, as they did not fit into the overall dimensions of the carousel and were not scaled proportionally to one another.  Finally, the resulting figures would not have met regulatory requirements.  (A photograph of the cardboard mock-ups is attached as Exhibit 7.)

34.    The Conservancy had been planning to schedule the fabrication of a full-scale prototype by spring 2007 (the "Second Prototype"), but was forced to postpone fabrication of the Second Prototype because the Conservancy lacked confidence that Ms. Broughel had produced anything that the fabricator could successfully use.  Ms. Broughel also delayed execution of a contract between the Conservancy and the fabricator by making unreasonable and unrealistic demands concerning her proposed compensation, her control of any intellectual property rights, and her future role in the Project.

35.    The Conservancy's attempt to use the only work Ms. Broughel performed under the Letter Contract showed that she had not done what was promised.  Her conduct also demonstrated that she did not possess the skill necessary to complete the Project and could not be

relied on to perform, let alone perform in a timely fashion. Accordingly, the Conservancy sent Ms. Broughel a letter dated March 21, 2007, terminating the Letter Contract. When Ms. Broughel responded with a letter dated April 6, 2007, and received on April 9, 2007, which purported not to understand her termination, the Conservancy sent her a second letter, dated April 12, 2007, explaining that she had been terminated for failure to perform the work under the Letter Contract for which she had been paid $20,000.00, and requesting reimbursement of that sum, but offering to allow Ms. Broughel to retain some portion of the $20,000.00 she had received in return for the assignment of any rights in the Fish Model and the resin samples.

36.     Ms. Broughel was overpaid by $20,000.00 because she never produced the "schematic, scalable" designs for each of the individual carousel figures required in the Letter Contract. The Conservancy as a not-for-profit organization is accountable to donors and cannot justify paying Ms. Broughel for work never performed.

37.     The Conservancy agreed to reimburse Ms. Broughel for materials, postage, and occasional travel at $.36 per mile, but the Conservancy had to pre-approve any such expenditures for them to qualify for reimbursement. On or about March 16, 2007, Ms. Broughel submitted an invoice to the Conservancy for expenses totaling $2,250.85 that had not been pre-approved or that were outside the scope of covered reimbursables. For example, Ms. Broughel sought reimbursement for the cost of hiring as assistant to perform work that was within the scope of the Letter Contract and for which the Conservancy had already paid her. In addition, Ms. Broughel billed for her travel at $.39 per mile. The Conservancy has offered to deduct from the $20,000.00 it seeks to recoup the amount of those expenses that are properly reimbursable.

38.    By letter dated June 18, 2007, to Ms. Broughel's attorney, the Conservancy, through its counsel, set out the facts of this dispute, and reiterated its offer of settlement.

39.    Ms. Broughel, in lieu of engaging in any negotiations, responded to the letters by instituting this lawsuit.

40.    The Conservancy is now forced to bear the costs of this litigation, as well as its impact on its public image and fundraising abilities.  In addition, the Conservancy is again forced to incur the cost of developing "schematic, scalable" designs and prototypes for the carousel figures.

<u>CAUSE OF ACTION</u>

BREACH OF CONTRACT

41.    The Conservancy restates and incorporates herein each of the above allegations in Paragraphs 1-40.

42.     Ms. Broughel breached the Letter Contract by failing to provide the required "schematic, scalable" designs.

43.    The Conservancy has been injured in the amount of $20,000.00 plus the cost of having others perform the work that Ms. Broughel failed to perform.  The reputation of the Conservancy has suffered because the Project has been delayed by years, and despite the Conservancy's good faith attempts to settle this dispute, the Conservancy must now incur the costs of this litigation, in amounts yet to be determined.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray for relief as follows:

(1)    Judgment dismissing the Complaint with prejudice, denial of any injunction; and

(2)    Judgment entered in their favor on the Counterclaim and an award of damages; and

(2)    An award of costs and expenses, and reasonable attorneys' fees, including an award under 17 U.S.C. § 505.

## DEMAND FOR JURY TRIAL

The Conservancy demands a jury.

Respectfully submitted,

_____/s/_____
Margaret K. Pfeiffer (MP4552)
Rita M. Carrier (RC3847)

1701 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-5805
Tel.:  (202) 956-7500
Fax:  (202) 293-6330

*Attorneys for Defendants/Counterclaimants*
The Battery Conservancy and Ms. Warrie Price