Margaret K. Pfeiffer (MP4552)
Rita M. Carrier (RC3847)
1701 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Tel.:  (202) 956-7500
Fax:  (202) 293-6330

*Attorneys for Defendants/Counterclaimants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x
                                                         :
BARBARA BROUGHEL,                                        :
                                                         :
        Plaintiff,                                   :    No. 07 Civ. 7755 (GBD)
                                                         :
        v.                                           :    ECF Case
                                                         :
                                                         :    ANSWER AND COUNTERCLAIM
THE BATTERY CONSERVANCY                                  :
AND WARRIE PRICE,                                        :    JURY TRIAL DEMANDED
        Defendants.                                  :
-------------------------------------------------------- x

      Defendants, The Battery Conservancy (the "Conservancy") and Ms. Warrie Price,

through their undersigned counsel, state as follows for their answers, defenses, and counterclaim

to Plaintiff's Complaint.

      1.     To the extent that Paragraph 1 purports to state conclusions of law, no

response is appropriate or required.  Defendants deny the averments of Paragraph 1, except admit

that the Plaintiff, Ms. Broughel, was notified by letter dated April 5, 2004, that she had been

selected through a competition to be a part of the design team for the Conservancy's project to

construct an aquatic-themed rideable carousel in Battery Park (the "Project"), and aver that the

scope of her participation on the team was to design rideable carousel figures.  Defendants

further admit that Ms. Broughel makes the stated claims.

2.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 2.

3.      Defendants admit the averments of Paragraph 3.

4.      Defendants admit that Ms. Warrie Price is the founder of the Conservancy, and that she serves as its President, as the Battery Administrator for the New York City Department of Parks & Recreation, and as the New York State Heritage Area Director. The second sentence of Paragraph 4 purports to state a conclusion of law to which no response is appropriate or required.

5.      To the extent that Paragraph 5 purports to state conclusions of law, no response is appropriate or required. Defendants deny that Ms. Broughel has stated a claim that jurisdiction lies under 28 U.S.C. § 1338(b) because the Complaint states no claim for unfair competition, and further deny that the amount in controversy exceeds $75,000.00 because the only amount that Ms. Broughel has claimed from the Conservancy is for costs and expenses of $2,250.85, while the Conservancy has claims against Ms. Broughel for $20,000.00.

6.      To the extent that Paragraph 6 purports to state conclusions of law, no response is appropriate or required. Defendants nevertheless admit that they are located in New York and that the alleged conduct took place, in whole or in part, in New York, making Defendants subject to the jurisdiction of this Court.

7.      To the extent that Paragraph 7 purports to state conclusions of law, no response is appropriate or required. Defendants nevertheless admit that the Conservancy's principal place of business is in New York, that Ms. Price resides in New York, and that a substantial part of the events giving rise to Ms. Broughel's claims occurred in New York, making this District a proper venue for this action.

8.    Defendants deny the averments of Paragraph 8, except admit that the Conservancy issued a "Call to Artists" on or about January 5, 2004, seeking to commission an artist or a team of artists to design and participate in the fabrication and installation of rideable aquatic figures for a carousel being designed by the architectural firm Weisz + Yoes (the "Architect"), with the selected artist to participate as part of the design team for the Project, and that artists were requested to respond by January 26, 2004, by submitting examples of prior works.  Defendants aver that the Conservancy agreed to pay an honorarium of $1,000.00 to each of the five finalists upon submission of their proposals (Call to Artists, at second page), and that Ms. Broughel was paid the $1,000.00 honorarium as agreed. (The Call to Artists is attached as Exhibit 1 to Defendants' Counterclaim.)  Defendants refer to the Call to Artists for a complete and accurate statement of its contents.

9.    Defendants deny the averments of Paragraph 9, except admit that Ms. Broughel was selected as a finalist, and aver that, on February 2, 2004, the Conservancy provided a Finalist's Proposal Package containing, *inter alia*, "The Battery Conservancy Marine Life Carousel Figures Artist Orientation Outline" (the "Orientation Outline") to Ms. Broughel and to two other individuals and two teams that had responded to the Call to Artists, inviting them to submit a visual depiction of their concepts including several carousel figures and the placement of the figures in the carousel, a written description of their approach to the Project, resumes, and a small scale model of one carousel figure.  (Orientation Outline, at 4.)  (The Orientation Outline is attached as Exhibit 2 to Defendants' Counterclaim.)  Defendants further aver that the Orientation Outline set out the artist's budget for the design of the figures, which, far from being "open-ended" as averred in Paragraph 9, was stated to be "up to $50,000 depending on the final scope of work," which specifically included all of the following: "Artist

3

Fee; Office/Studio expenses and labor related to this project; Presentation drawings and models as required for approvals and fundraising; Working drawings, models, templates and prototypes as required for fabrication; Artist's Travel; Shipping of working drawings, models or prototypes to fabricator; [and] All Risk Art Insurance." (*Id.* at 3.) Defendants refer to the Orientation Outline for a complete and accurate statement of its contents.

10.     Defendants deny the averments of Paragraph 10, except admit that Ms. Broughel was awarded a position on the design team of the Project, based principally on a model of a fish made of translucent cast resin as suggested in the Orientation Outline (the "Fish Model") (*id.* at 2), and a "script" likening the carousel experience to swimming underwater.

11.     Defendants deny the averments of Paragraph 11.

12.     Defendants deny the averments of Paragraph 12, except admit that, in connection with the Conservancy's 2004 annual benefit, Ms. Broughel provided a duplicate of the Fish Model. Defendants aver that, also in connection with the Conservancy's 2004 annual benefit, Ms. Broughel allowed the Conservancy to reproduce watercolor paintings that she had made and to distribute these reproductions at the annual benefit, which Ms. Broughel attended. Defendants further aver that, in responding to the Orientation Outline, Ms. Broughel agreed to provide "one life-size figure" for the annual benefit (*id.* at 5), and that the duplicate of the Fish Model did not have the same qualities as the original Fish Model for which Ms. Broughel was awarded the position on the design team. Defendants also aver that Ms. Broughel, by responding to the Orientation Outline, also agreed to provide "Presentation drawings and models as required for approvals and fundraising" (*id.* at 3), but that she retained possession of the watercolor paintings, that she subsequently displayed the watercolor paintings in a gallery where they were put on sale, and that at least one was purchased for her benefit. Defendants further aver that it is

4

public knowledge that the Conservancy's annual benefit has always raised money for operating costs of the Conservancy, and that it has been the practice of artists and vendors to donate their services, in whole or in part, for the purposes of the benefit.  Defendants also aver that despite this practice and in view of the need to maintain a good working relationship with Ms. Broughel, on or about July 19, 2004, the Conservancy paid, and Ms. Broughel accepted, an honorarium of $5,000.00 as payment in full for the duplicate of the Fish Model and the use of the watercolor paintings.

      13.     Defendants deny the averments of Paragraph 13, except admit, upon information and belief, that on January 20, 2006, Ms. Broughel entered into a contract with the Architect, and aver that the contract between the Architect and Ms. Broughel (the "W+Y Contract") did not contain the language "species selection," and further aver that the W+Y Contract contained a Phase II which required that Ms. Broughel "Document Design of Overall Figures and Individual Figure Details for Budget/Bid Pricing." (W+Y Contact, at 2.)  (The W+Y Contract is attached as Exhibit 3 to Defendants' Counterclaim.)  Defendants refer to the W+Y Contract for a complete and accurate statement of its contents

      14.     Defendants deny the averments of Paragraph 14, and deny knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 14 that pertain to the W+Y Contract, and aver, upon information and belief, that Ms. Broughel failed to perform in a timely manner, failed adequately to perform Phase I of the W+Y Contract, and never performed Phase II.  Defendants also aver, upon information and belief, that by February 2006, it had become apparent to the Architect that Ms. Broughel would not produce the detailed drawings required by the fabricator to proceed with the Project, and that, on March 16, 2006, the Architect informed the Conservancy that it had terminated Ms. Broughel through a  March 15,

2006 e-mail stating "[w]e have been informed by PRG [the fabricator], that in order to make the April 25th deadline, your work with them is finished. . . . We consider your work on the project finished. Thank you for your participation in the project."

        15.     Defendants deny the averments of Paragraph 15 to the extent they refer to Ms. Price, and deny, upon information and belief, the averments to the extent they refer to the Architect.

        16.     Defendants deny the averments of Paragraph 16, and aver that Ms. Price made every effort to soothe Ms. Broughel's ego in an attempt to persuade her to work cooperatively with the design team.

        17.     Defendants deny the averments of Paragraph 17.

        18.     Defendants deny the averments of Paragraph 18, and aver that, with the exception of the Fish Model, none of the work created by Ms. Broughel was used for any approval or permitting process. Defendants further aver that, in any event, in responding to the Orientation Outline, Ms. Broughel agreed to provide "Presentation drawings and models as required for approvals and fundraising." (Orientation Outline, at 3.)

        19.     Defendants deny the averments of Paragraph 19, except aver, upon information and belief, that Phase I of the W+Y Contract required Ms. Broughel to provide designs for all of the carousel figures that met code rideabilty requirements, and that she failed to produce these designs.

        20.     Defendants deny the averments of Paragraph 20, except aver that Ms. Broughel repeatedly sent revised budgets and timelines in a pattern of increasing costs and delay. Defendants further aver that the Conservancy had no contract with Ms. Broughel in January or

April 2006, was not a party to the W+Y Contract, and was under no contractual obligation to pay Ms. Broughel for any services provided under the W+Y Contract.

21.    Defendants deny the averments of Paragraph 21, except aver that, by May 2006, the Conservancy understood that Ms. Broughel had not produced the necessary designs for the individual carousel figures, and entered into negotiations to try to reach an amicable resolution of Ms. Broughel's participation in the Project. Defendants deny knowledge or information sufficient to form a belief as to the truth of the averments as to why Ms. Broughel rejected the offer.

22.    Defendants deny the averments of Paragraph 22, except admit that in hopes of salvaging the investment made in Ms. Broughel, and relying on representations by Ms. Broughel that she understood the requirements of the designs to be produced and was capable of producing them, the Conservancy and Ms. Broughel entered into a letter contract dated July 12, 2006 (the "Letter Contract"), at which time the Conservancy paid Ms. Broughel $20,000.00 in advance and she agreed to produce, in the near future, "a schematic, scalable design for each of the individual Carousel Figures showing human scale relationship and size . . . [and] indicat[ing] color, scale, and pattern concepts" (which she had failed to do under the W+Y Contract). Defendants aver that Ms. Broughel agreed to direct the production of a full-scale prototype model of half a fish (the "Second Prototype") as a pro-bono, tax deductible contribution to the Conservancy, and aver that Ms. Broughel also agreed to produce on a pro-bono basis 10-12 initial experimental resin samples, at a cost not to exceed $300.00, and that she also agreed that the Conservancy would pay the following estimated costs of the Second Prototype, subject to the Conservancy's securing funding:  modeling ($10,000.00); mold making ($3,000.00-$5,000.00); and casting and armature ($4,500.00). Defendants refer to the Letter Contract for a complete and

accurate statement of its contents.  (The Letter Contract is attached as Exhibit 4 to Defendants'
Counterclaim.)

23.    Defendants deny the averments of Paragraph 23, except admit that Ms.
Broughel worked on clay fish models and examples of materials of which the "skin" of the
carousel figures would be made, and attempted to coordinate production of the Second Prototype
with the fabricator, and aver that the production of the chandelier element was covered by a side
agreement and was fully performed by both parties.

24.    Defendants deny the averments of Paragraph 24, except admit that, in
early 2007, the Conservancy decided not to proceed with the fabrication of the Second Prototype,
and aver that the Conservancy reached this decision because it was not confident that Ms.
Broughel had produced any materials that would enable the fabricator to produce the Second
Prototype.

25.    Defendants deny the averments of Paragraph 25, except admit that, in
response to several e-mails in early 2007 from Ms. Broughel requesting that the Conservancy
issue her a letter recognizing her pro-bono contribution for 2006, the Conservancy provided her a
letter dated February 15, 2007, acknowledging pro-bono work from June 1 to December 31,
2006, in the value of $19,368.00, based upon information provided by Ms. Broughel.
Defendants deny knowledge or information sufficient to form a belief as to the truth of whether a
tax deduction was permissible under the applicable tax laws.

26.    Defendants deny the averments of Paragraph 26, except admit that the
Conservancy, by letter dated March 21, 2007, terminated the Letter Contract with Ms. Broughel
due to Ms. Broughel's breach of contract.

8

27.     Defendants deny the averments of Paragraph 27, except admit that the Conservancy sent a letter to Ms. Broughel on April 12, 2007, explaining its reasons for terminating her, and aver that, on March 5, 2007, Ms. Price had met with Ms. Broughel and had told her that the Conservancy had decided to go forward with the Project without her participation and had urged Ms. Broughel to take her possessions from the Conservancy's offices.  Defendants further aver that, going to great lengths to try to avoid offending Ms. Broughel's ego, Ms. Price, on behalf of the Conservancy, sent a letter dated March 21, 2007, terminating Ms. Broughel without detailing the latter's failures, and that, in response to a letter dated April 6, 2007, from Ms. Broughel, which purported not to understand her termination by the Conservancy, Ms. Price, on behalf of the Conservancy, on April 12, 2007, sent Ms. Broughel a second letter that restated the Conservancy's termination of Ms. Broughel and detailed her failures to perform the services required under the Letter Contract, which formed the grounds for termination.

<u>CLAIM I</u>

28.     Defendants repeat and incorporate their responses to Paragraphs 1-27.

29.     Defendants deny the averments of Paragraph 29, and aver that the design team of the Project, not including Ms. Broughel, is the author of the bulk of the designs of the Project, except admit that Ms. Broughel created limited conceptual designs for proposed carousel figures.

30.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 30, except admit that Ms. Broughel has attached to the Complaint a copy of a Certificate of Registration dated March 22, 2007.

31.     Defendants deny the averments of Paragraph 31, and aver that none of Ms. Broughel's designs were or could be used in the Project.

9

32.    Defendants deny the averments of Paragraph 32.

## CLAIM II

33.    Defendants repeat and incorporate their responses to Paragraphs 1-27.

34.    Defendants deny the averments of Paragraph 34, aver that the only contract that existed between the Conservancy and Ms. Broughel was the Letter Contract, and further aver that the Conservancy fully performed its obligations under the Letter Contract by paying Ms. Broughel $20,000.00, and that, because she failed to perform, she was in fact overpaid by $20,000.00.

35.    Defendants deny the averments of Paragraph 35.

36.    Defendants deny the averments of Paragraph 36.

## CLAIM III

37.    Defendants repeat and incorporate their responses to Paragraphs 1-27.

38.    Paragraph 38 purports to state conclusions of law to which no response is appropriate or required.  Defendants deny that the Conservancy ever issued an RFP and that the Orientation Outline constituted a binding contract, and aver that the W+Y Contract, to which the Conservancy was not a party, set out Ms. Broughel's obligations in Phase I.

39.    Defendants deny the averments of Paragraph 39.

40.    Defendants deny the averments of Paragraph 40.

## CLAIM IV

41.    Defendants repeat and incorporate their responses to Paragraphs 1-27.

42.    Defendants deny the averments of Paragraph 42.

43.    Defendants deny the averments of Paragraph 43.

44.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the averment of Paragraph 44, except aver that, in her invoice for recognition of

pro-bono services, Ms. Broughel billed her time at $75.00 per hour. Defendants further aver that on January 10, 2007, Ms. Broughel submitted to the Conservancy a tally of 276.75 hours that she agreed to donate, that she requested an acknowledgment of this time at $75.00 per hour, totaling $20,718.00, and that the Conservancy acknowledged her contribution of $19,368.00 by letter dated February 15, 2007.

45.    Defendants deny the averments of Paragraph 45.

<u>CLAIM V</u>

46.    Defendants repeat and incorporate their responses to Paragraphs 1-27.

47.    Defendants deny the averments of Paragraph 47.

48.    Defendants deny the averments of Paragraph 48.

49.    Defendants deny the averments of Paragraph 49.

50.    Defendants deny the averments of Paragraph 50.

<u>CLAIM VI</u>

51.    Defendants repeat and incorporate their responses to Paragraphs 1-27.

52.    Defendants deny the averments of Paragraph 52, and deny knowledge or information sufficient to form a belief as to that which Ms. Broughel understood, and aver that Ms. Broughel received a $1,000.00 honorarium for submitting her proposal in response to the Call to Artists.

53.    Ms. Price denies the averments of Paragraph 53, except admits that she knew that Ms. Broughel was selected as a member of the design team.

54.    Ms. Price denies the averments of Paragraph 54, except admits that she was aware of the contents of the Orientation Outline.

55.    Ms. Price denies the averments of Paragraph 55.

11

56.    Ms. Price denies the averments of Paragraph 56, and avers that any injury incurred by Ms. Broughel was caused by her own actions, including her breach of both the W+Y Contract and the Letter Contract.

<u>CLAIM VII</u>

57.    Defendants repeat and incorporate their responses to Paragraphs 1-27.

58.    Defendants deny the averments of Paragraph 58, except admit, upon information and belief, that Ms. Broughel had a contract with W+Y of which Ms. Price was aware.

59.    Ms. Price denies the averments of Paragraph 59.

60.    Ms. Price denies the averments of Paragraph 60.

61.    Ms. Price denies the averments of Paragraph 61, and avers that any injury incurred by Ms. Broughel was caused by her own actions, including her breach of both the W+Y Contract and the Letter Contract.

<u>CLAIM VIII</u>

62.    Defendants repeat and incorporate their responses to Paragraphs 1-27.

63.    Defendants deny the averments of Paragraph 63, and aver that the balance of hardships weighs in favor of the continuation of the Project without Ms. Broughel.


Defendants deny that Ms. Broughel is entitled to any relief whatsoever.


**ADDITIONAL AND AFFIRMATIVE DEFENSES**

Defendants assert the following defenses without assuming the burden of proof when the burden of proof would otherwise be on the Plaintiff.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state any claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

With the possible exception of the Fish Model, Ms. Broughel provided no copyrightable work concerning the Project.

## THIRD AFFIRMATIVE DEFENSE

Defendants have not created any derivative works from Ms. Broughel's work.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's inability and failure to perform the contracted-for services, and not any conduct or act of Defendants, have been the direct or proximate cause of any injury that Plaintiff has sustained.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff is estopped from recovery due to her own conduct and actions, including, without limitation, her breach of contract.

## SIXTH AFFIRMATIVE DEFENSE

The claims asserted in Plaintiff's Complaint are barred by the doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's alleged claims for compensation have been satisfied by accord and satisfaction.

## EIGHTH AFFIRMATIVE DEFENSE

By her own conduct, Plaintiff waived any right to recovery against the Defendants.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Defendants are barred by her fraudulent representations that she possessed the necessary qualifications and skills to fulfill the requirements of the Project.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff is barred from recovery because she has been duly paid for her services.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff is barred from asserting a claim in copyright because the Orientation Outline created a license to use the works she produced for the Project for the purposes stated in the Orientation Outline, and she further agreed to the Conservancy's use of the Fish Model and the copies of the watercolor paintings.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiff is barred from asserting a claim of breach of contract or interference with contract due to failure of consideration.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by acquiescence.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole, or in part, by the Statute of Frauds.

### **COUNTERCLAIM**

### PARTIES

1.     The Battery Conservancy (the "Conservancy"), Defendant/Counterclaimant, is a 501(c)(3) not-for-profit educational corporation incorporated in the state of New York, with its place of business at 1 New York Plaza, Concourse Level, New

York, New York 10004. The Conservancy's mission is to rebuild and revitalize the Battery, the park at the tip of Manhattan, and the park's major landmark, Castle Clinton National Monument. With public and private support, the Conservancy is rebuilding the park through design excellence and innovation.

2.    Ms. Warrie Price, Defendant/Counterclaimant, is the founder of the Conservancy, and she serves as its President as well as the Battery Administrator for the New York City Department of Parks & Recreation and the New York State Heritage Area Director. She is a resident of, and domiciled in, the state of New York. Ms. Price has built partnerships with city, state, and federal agencies. Ms. Price served for two years on the Manhattan Borough President's Taskforce, and she has served on the board of the Metropolitan Waterfront Alliance and on the board of Scenic Hudson. As chair of Manhattan's Community Board #8, she was instrumental in creating new waterfront access along the East River and worked to renovate six community parks on the Upper East Side.

3.    Upon information and belief, Plaintiff/Counterclaim-Defendant, Barbara Broughel, is a resident of, and domiciled in, the state of Connecticut.

JURISDICTION AND VENUE

4.    If this Court accepts jurisdiction as a matter of federal copyright law under 28 U.S.C. §§ 1331, 1338(a), and supplemental jurisdiction under 28 U.S.C. § 1367, then this Court has jurisdiction over this Counterclaim to the same extent it has jurisdiction over the Complaint.

5.    This Court has personal jurisdiction over Ms. Broughel because the actions and omissions giving rise to this Counterclaim occurred in the state of New York and in this District, and because she has submitted to the jurisdiction of this Court by filing her Complaint.

15

6.      Venue in this district is proper under 28 U.S.C. § 1391(b)(1) because the

Conservancy is situated in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial

part of the events and omissions giving rise to the claim occurred in this District.

FACTUAL ALLEGATIONS

7.      On or about January 5, 2004, the Conservancy posted on the New York

Foundation for the Arts website and four other websites a "Call to Artists" to design rideable

carousel figures for the Conservancy's project to construct an aquatic-themed, rideable carousel

in Battery Park (the "Project").  The Call to Artists included information concerning the Project,

two drawings of the proposed carousel from the architectural firm that had already been retained

to design the carousel, Weisz + Yoes (the "Architect"), and examples of the aquatic species that

could be represented as carousel figures, and explained that the carousel will feature thirty

figures cast in resin, representing a selection of marine life that was displayed in the original

Battery Park aquarium.  To be considered for participation in the design team for the Project, the

artists were asked to submit, by January 26, 2004, references, resumes, slides of their prior work,

and a completed brief questionnaire.  (The Call to Artists is attached as Exhibit 1.)

8.      Of the many artists and teams of artists that responded to the Call to

Artists, the Conservancy invited five finalists, three individuals and two teams, to submit formal

proposals.  On February 2, 2004, the finalists were given a Finalist's Proposal Package which

included, *inter alia*, the "The Battery Conservancy Marine Life Carousel Figures Artist

Orientation Outline" (the "Orientation Outline"), as a non-binding guide to the selection process.

The Orientation Outline included: (i) general information on the Battery; (ii) a description of the

Project (including the concept that riding the carousel should evoke in the rider a sense of

"swimming with the marine life" (Orientation Outline, at 2)); (iii) the scope of the artist's

participation (including the recommendation that the figures be made of a translucent cast resin

16

material (*id.*); and (iv) a "budget" specifying that "[t]he artist's budget will be up to $50,000 depending on the final scope of work," (*id.* at 3.). It was further specified that "[t]he artist's budget will cover: Artist Fee; Office/Studio expenses and labor related to this project; Presentation drawings and models as required for approvals and fundraising; Working drawings, models, templates and prototypes as required for fabrication; Artist's Travel; Shipping of working drawings, models or prototypes to fabricator; [and] All Risk Art Insurance." (*Id.*) The Orientation Outline also described the artist selection process, listed the eight members of the selection committee, described what the proposals should contain, and provided information on contracting. It also stated that the artist would create "one life-size figure" for presentation at the Conservancy's annual fundraising event, and made the statement that the "carousel fabricator will be responsible to build and install the carousel." (*Id.* at 5.) The Orientation Outline further specified that an honorarium of $1,000.00 would be "awarded to the finalists upon submission of the proposals," and that that amount "must cover all expenses related to the submission including artists [sic] travel." (*Id.* at 4.) While the "proposal will remain the property of the artist," the "Conservancy reserves the right to retain the proposal for up to one year for display purposes, and the right to reproduce it for documentation purposes." (*Id.*) The Finalist's Proposal Package also included sketches and diagrams of the Battery, a lengthy list of animals to be considered for the carousel figures, and architectural drawings indicating the recommended size, scale, and placement of the carousel figures on the carousel platform. (The Finalist's Proposal Package cover sheet and the Orientation Outline are attached as Exhibit 2.)

       9.     On or about February 12, 2004, Ms. Broughel entered into a "Finalist Proposal Agreement" whereby she agreed to submit a proposal for the Project and the Conservancy agreed to pay $1,000.00 for, *inter alia*, "the right to document the proposals and

keep them for display for up to one year." By entering into this agreement, Ms. Broughel held herself out to the Conservancy as possessing the necessary skills to complete the Project.

10.    On March 23, 2004, Ms. Broughel presented to the selection committee her proposal, which consisted of one model of a fish made of translucent cast resin (the "Fish Model") accompanied by a "script" likening the carousel experience to swimming underwater.

11.    The selection committee chose Ms. Broughel, and sent her notification in an award letter dated April 5, 2004, stating that she was "selected as [sic] to be part of the team for the Battery Carousel project" because her "proposal was the most closely inspired by our original concept of 'swimming with the fishes.'" The letter went on to state, "Thank you for coming in immediately on Wednesday to begin discussion with us on the next steps to insure that we have a fabulous display for the Gala on June 7. As we discussed, we'll be following up to develop a firm up [sic] the scope of work and schedule for the first design phase and the future project phases."

12.    On June 7, 2004, the Conservancy hosted its annual fundraising gala, and pursuant to the Orientation Outline, Ms. Broughel reproduced the Fish Model as the required "one life-size figure." (Orientation Outline, at 5.) The duplicate of the Fish Model, however, did not have the same qualities as the original for which Ms. Broughel was awarded the position on the design team; it was not as translucent as the original, had a less attractive color and texture, and lacked the sense of movement present in the original. Ms. Broughel also created a series of watercolor paintings of fish pursuant to the Orientation Outline's requirement that she provide "Presentation drawings and models as required for approvals and fundraising." (*Id.* at 3.) She, however, retained physical possession of the watercolor paintings, allowing the Conservancy only to make copies of them to be distributed at the annual fundraising gala, which she attended.

She also displayed the watercolor paintings at a gallery, where they were put on sale and at least one of them was sold for her benefit.

13.     Even though it has been the practice of artists and vendors to donate their services, in whole or in part, for the purposes of the Conservancy's annual benefit, which has always raised money for operating costs of the Conservancy, Ms. Broughel surprised the Conservancy by presenting it with a bill of $28,818.00 for the less-than-satisfactory reproduction of the Fish Model and the use of the watercolor paintings, which bill included a "profit margin."

14.     Although the Conservancy had not expected to pay Ms. Broughel for any such expenditures or profit associated with the reproduction of the Fish Model and the creation of the watercolor paintings, on or about July 19, 2004, the Conservancy, recognizing the close working relationship necessary to complete the Project, paid, and Ms. Broughel accepted, an honorarium of $5,000.00 as full compensation for the services that were the subject of her invoice.

15.     On information and belief, there was a lengthy period while Ms. Broughel engaged in contract negotiations with the Architect. On information and belief, Ms. Broughel caused the formation of a contract to be delayed due to making, through her attorney, unreasonable demands concerning her intellectual property rights and her participation in, and control of, the Project. On information and belief, Ms. Broughel agreed to contract with the Architect because the Architect headed the design team, and the team members subcontracted with the Architect.

16.     On information and belief, on January 20, 2006, Ms. Broughel entered into a contract with the Architect (the "W+Y Contract") as one of the subcontractors on the Project team. The W+Y Contract set out tasks in two phases:  under Phase I Ms. Broughel was

required to (1) "Collaborate with Design Team to develop interior design elements of the Carousel"; (2) develop an "Overall Plan for Carousel Figures"; (3) develop a "Design for each of the individual Carousel Figures"; (4) create a "Model of the Carousel + Figures @ small scale (physical model to be produced with Scenic Technologies)"; and (5) develop a "Prototype of one Figure @ full scale (physical model to be produced with Scenic Technologies)." Under Phase II, she was required to "Document Design of Overall Figures and Individual Figure Details for Budget/Bid Pricing." (W+Y Contract, at 2.) (The W+Y Contract is attached as Exhibit 3.)

17.    On information and belief, Ms. Broughel was first to create conceptual designs of all of the carousel figures, with aesthetics similar to the Fish Model she had created for her proposal. She was then to translate the designs into scaled drawings or 3-dimensional models that would indicate how to make rideable figures with enough detailed measurements and dimensions to provide a fabricator (a mold-maker and producer of the actual figures) sufficient information to estimate the amount of work involved in building all of the figures and to build a prototype of one figure (the "Required Designs"). The Required Designs should have set out the form, shape, size, texture, color, and scale of the figures so that their relationship to each other and to the carousel pavilion could be determined, demonstrated how a person would mount, ride, and dismount the figures, and indicated how the figures might move.

18.    On information and belief, Ms. Broughel was paid a total of $18,000.00 in advance by W+Y to perform the Phase I contracted-for services.

19.    On information and belief, Ms. Broughel did not translate her conceptual designs into the Required Designs. For example, on information and belief, on February 17, 2006, the fabricator requested that she provide, *inter alia*, dimensioned scale drawings, cross section drawings, and a scaled "white" model (a working model of a figure to indicate form

made of a plain material and not indicating color or texture). On information and belief, in response, on February 20, 2006, Ms. Broughel contacted the fabricator and stated that she could not provide the requested cross section drawings because she did not know what material she would be using, and that she could not create the required model because she had a broken arm and her assistant had never done that type of work with her before, and she still had "to figure out and acquire materials for the model."

20.      On information and belief, on February 21, 2006, when responding to repeated requests from the Architect and the fabricator for the Required Designs, she stated that she did not know how to use the computer program to make detailed drawings: "I DO NOT CONVERSANT [sic] WITH THE CAD PROGRAM USED TO MAKE THESE. I MAY BE ABLE TO MAKE THEM SOMETHING IN PHOTOSHOP INSTEAD...UNLESS THERE IS SOMEONE THERE (YOURSELF EVEN?) WHO CAN HELP WITH CAD DWGS?" Then, two days later, on February 23, 2006, she admitted that "[t]he drawings I sent . . . do not have width dimensions for the fins or tail."

21.      On information and belief, Ms. Broughel asked the Architect or the fabricator to do research as well as to create drawings for her. On February 23, 2006, she wrote to the fabricator: "Perhaps [a fabricator employee] can get any code requirements on the materials for handles and stirrups" and also asked that this employee recommend fiber optic materials and "provide some samples of her recommendations."

22.      On information and belief, Ms. Broughel also proved herself to be unreasonably difficult to work with and incapable of working on a team. For example, on a March 8, 2006 conference call with the members of the design team working on the prototype,

the participants agreed that, as is the general practice, all communications with the fabricator would be routed through the Architect in order to prevent confusion.

23.    On information and belief, the Architect determined that it could no longer work with Ms. Broughel, and terminated her services under their contract in an e-mail dated March 15, 2006, stating "[w]e have been informed by PRG [the fabricator], that in order to make the April 25th deadline, your work with them is finished. For us to make this deadline as well, we must work with the material we have from you to date. Therefore, please send your final and total fee invoice for the work you have completed. We consider your work on the project finished. Thank you for your participation in the project." On information and belief, on March 15, 2006, Ms. Broughel responded "OK."

24.    On information and belief, on March 26, 2006, Ms. Broughel ignored her termination and sent a letter to the fabricator stating that "I will need to be able to directly communicate with all fabricators and sub-contractors on an as-needed basis." Despite the statement in the Orientation Outline that the "fabricator will be responsible to build and install the carousel" (Orientation Outline, at 5), Ms. Broughel indicated in the letter that she also needed to "supervise the final installation of the figures and sculptural elements into the carousel." Even though the fabricator's contract was with the Architect, and Ms. Broughel had agreed that the Architect had terminated her participation in the Project, Ms. Broughel concluded the letter by stating, "[i]f you or your subcontractors cannot meet the minimum requirements I have outlined above, please inform me as soon as it is possible to do so, so that we may move forward in the selection of a suitable working partner on the fabrication of the figures."

25.     On or about March 29, 2006, informed by correspondence received contemporaneously and on information and belief, Ms. Broughel again contacted the fabricator directly by e-mail asking for detailed reports and dictating instructions.

26.     Ms. Price, attempting to keep the Project team from dissolving, allowed Ms. Broughel to continue to provide some materials to the fabricator.  The fabricator attempted to use these materials but the resulting prototype was unsatisfactory, possessing none of the translucency of the Fish Model and having a cartoon-like quality, an attribute specifically discouraged in the Orientation Outline. (*See* Orientation Outline, at 2.)

27.     On information and belief, Ms. Broughel failed adequately to perform Phase I of the W+Y Contract and never performed Phase II.

28.     By agreement dated July 10, 2006, the Conservancy and the Architect acknowledged the severance of Ms. Broughel's relationship with the Architect and agreed that Ms. Broughel would report directly to the Conservancy.

29.     The Conservancy, hoping to salvage the investment made in Ms. Broughel, and relying on representations by Ms. Broughel that she understood the requirements of the designs to be produced and was capable of producing them, entered into a letter contract with Ms. Broughel dated July 12, 2006 (the "Letter Contract"), under which the Conservancy paid Ms. Broughel $20,000.00 in advance as consideration for her agreement to produce, in the near future, "a schematic, scalable design for each of the individual Carousel Figures showing human scale relationship and size . . . [and] indicat[ing] color, scale, and pattern concepts" (which she had failed to do under the W+Y Contract).  Ms. Broughel agreed to direct the production of a full-scale prototype model of half a fish (the "Second Prototype") as a pro-bono, tax deductible contribution to the Conservancy and to produce on a pro-bono basis 10-12 initial

experimental resin samples, at a cost not to exceed $300.00. Ms. Broughel also agreed that the Conservancy would pay the following estimated costs of the Second Prototype, subject to the Conservancy's securing funding: modeling ($10,000.00); mold making ($3,000.00-$5,000.00); and casting and armature ($4,500.00). (The Letter Contract is attached as Exhibit 4.)

30.    In late July 2006, Ms. Broughel produced several resin samples, but by November 2006, the Conservancy had not received any other work product from Ms. Broughel.

31.    The Conservancy made multiple oral and written requests to Ms. Broughel for the designs for the individual carousel figures. In early November 2006, the Conservancy informed Ms. Broughel that the work she had created thus far was not adequate: "The photos of the fish you sent [prior to the Letter Contract], while very detailed, do not provide adequate information for us to fabricate the full scale mock up that Warrie has requested." In late November 2006, the Conservancy still had not received any adequate designs and inquired, "[w]hen will you send us the scaled photos or drawings of all the fish? . . . The design of the figures with the 'rideabilitiness factor' is required as part of the work you are to do."

32.    Rather than providing the "schematic, scalable" designs for each of the individual carousel figures she had agreed to produce under the Letter Contract, Ms. Broughel made thirty-two very small (4 to 10 inch) clay models. She refused to send the Conservancy the models, and only provided the Conservancy with photographs of them. The Conservancy suggested that Ms. Broughel produce these models to facilitate her development of the "schematic, scalable" designs, but she never produced any "schematic, scalable" designs. The photographs of the clay models were not an adequate basis for producing rideable carousel figures; none was properly scaled for the fabricator to use to produce a full-size figure, and the

24

measurements were inconsistent. (Photos of the hammerhead shark clay model and smaller clay figures on the carousel platform, with differing measurements, are attached as Exhibits 5 and 6.)

33.     The inadequacy of the photographs and models was demonstrated when, in an effort to determine whether the fabricator could use Ms. Broughel's photographs of the clay models to construct the carousel figures, the Conservancy, without Ms. Broughel's assistance, made full-scale cardboard mock-ups of the figures, using the photographs and scaling them up to produce the mock-ups. This effort showed that the carousel figures that Ms. Broughel's models would produce were not rideable—a child could not get on, safely ride, or get off the figures because the height and width of the figures were too great; and there were no footholds, handholds, or indications of seatbelts. Furthermore, the scale of the figures was wrong, as they did not fit into the overall dimensions of the carousel and were not scaled proportionally to one another. Finally, the resulting figures would not have met regulatory requirements. (A photograph of the cardboard mock-ups is attached as Exhibit 7.)

34.     The Conservancy had been planning to schedule the fabrication of a full-scale prototype by spring 2007 (the "Second Prototype"), but was forced to postpone fabrication of the Second Prototype because the Conservancy lacked confidence that Ms. Broughel had produced anything that the fabricator could successfully use. Ms. Broughel also delayed execution of a contract between the Conservancy and the fabricator by making unreasonable and unrealistic demands concerning her proposed compensation, her control of any intellectual property rights, and her future role in the Project.

35.     The Conservancy's attempt to use the only work Ms. Broughel performed under the Letter Contract showed that she had not done what was promised. Her conduct also demonstrated that she did not possess the skill necessary to complete the Project and could not be

relied on to perform, let alone perform in a timely fashion. Accordingly, the Conservancy sent Ms. Broughel a letter dated March 21, 2007, terminating the Letter Contract. When Ms. Broughel responded with a letter dated April 6, 2007, and received on April 9, 2007, which purported not to understand her termination, the Conservancy sent her a second letter, dated April 12, 2007, explaining that she had been terminated for failure to perform the work under the Letter Contract for which she had been paid $20,000.00, and requesting reimbursement of that sum, but offering to allow Ms. Broughel to retain some portion of the $20,000.00 she had received in return for the assignment of any rights in the Fish Model and the resin samples.

      36.     Ms. Broughel was overpaid by $20,000.00 because she never produced the "schematic, scalable" designs for each of the individual carousel figures required in the Letter Contract. The Conservancy as a not-for-profit organization is accountable to donors and cannot justify paying Ms. Broughel for work never performed.

      37.     The Conservancy agreed to reimburse Ms. Broughel for materials, postage, and occasional travel at $.36 per mile, but the Conservancy had to pre-approve any such expenditures for them to qualify for reimbursement. On or about March 16, 2007, Ms. Broughel submitted an invoice to the Conservancy for expenses totaling $2,250.85 that had not been pre-approved or that were outside the scope of covered reimbursables. For example, Ms. Broughel sought reimbursement for the cost of hiring as assistant to perform work that was within the scope of the Letter Contract and for which the Conservancy had already paid her. In addition, Ms. Broughel billed for her travel at $.39 per mile. The Conservancy has offered to deduct from the $20,000.00 it seeks to recoup the amount of those expenses that are properly reimbursable.

38. By letter dated June 18, 2007, to Ms. Broughel's attorney, the Conservancy, through its counsel, set out the facts of this dispute, and reiterated its offer of settlement.

39. Ms. Broughel, in lieu of engaging in any negotiations, responded to the letters by instituting this lawsuit.

40. The Conservancy is now forced to bear the costs of this litigation, as well as its impact on its public image and fundraising abilities. In addition, the Conservancy is again forced to incur the cost of developing "schematic, scalable" designs and prototypes for the carousel figures.

CAUSE OF ACTION

BREACH OF CONTRACT

41. The Conservancy restates and incorporates herein each of the above allegations in Paragraphs 1-40.

42. Ms. Broughel breached the Letter Contract by failing to provide the required "schematic, scalable" designs.

43. The Conservancy has been injured in the amount of $20,000.00 plus the cost of having others perform the work that Ms. Broughel failed to perform. The reputation of the Conservancy has suffered because the Project has been delayed by years, and despite the Conservancy's good faith attempts to settle this dispute, the Conservancy must now incur the costs of this litigation, in amounts yet to be determined.

PRAYER FOR RELIEF

WHEREFORE, Defendants pray for relief as follows:

(1)    Judgment dismissing the Complaint with prejudice, denial of any injunction; and

(2)    Judgment entered in their favor on the Counterclaim and an award of damages; and

(2)    An award of costs and expenses, and reasonable attorneys' fees, including an award under 17 U.S.C. § 505.


DEMAND FOR JURY TRIAL

The Conservancy demands a jury.


Respectfully submitted,


_____/s/_____
Margaret K. Pfeiffer (MP4552)
Rita M. Carrier (RC3847)

1701 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-5805
Tel.:  (202) 956-7500
Fax:  (202) 293-6330

*Attorneys for Defendants/Counterclaimants*
The Battery Conservancy and Ms. Warrie Price

# EXHIBIT 1



**The Battery Conservancy**
**Marine Life Carousel Figures**
**Call to Artists**
**Deadline:  January 26, 2004**

The Battery Conservancy seeks to commission an artist or a team of artists to design and participate in the fabrication and installation of 28 figures plus 2 chariots for the Battery Carousel.  This one-of-a-kind feature is being designed to create the sensation of an underwater experience that recalls the first Aquarium, which was located in Castle Clinton from 1896-1941.

**Background:**  As the birthplace of New York, the Battery's history is colorful and varied.  The park is at the confluence of the Hudson and East Rivers where the earliest Dutch settlers landed in 1623, and where the first "battery" of cannons was erected to defend New Amsterdam. Castle Clinton, the circular fort, was built in anticipation of the War of 1812, a decade later it was renamed Castle Garden and was transformed into the city's premier cultural center.  By 1855 successive landfills had enlarged the Park to encompass Castle Garden and the structure became America's first immigrant receiving center, welcoming 7 million people before it was succeeded by Ellis Island.  In 1896, the Castle was converted into the city's first public aquarium until its partial demolition in 1941.

The Battery Conservancy, a not-for-profit educational corporation, was created in 1994 to revitalize Battery Park and renew the spirit of Castle Clinton National Monument, the park's major landmark.  The Conservancy's goals are to return the Battery to its historic role as a center of downtown cultural life and to create a vibrant urban landscape on the waterfront that honors its heritage and inspires its four million annual visitors.

The first renovation phase focusing on the waterfront is complete with the opening of the Dewey Promenade in May 1998, and *River That Flows Two Ways;* Wopo Holup's seawall railing, installed in June 2000, that depicts the cultural and natural history of the Battery.  The reconstruction of the Upper Promenade that parallels the Dewey Promenade was completed in December 2001.  The Perimeter/Bikeway along State Street and Battery Place is currently in design development.  Castle Clinton is undergoing planning for an adaptive reuse.  The Bosque area of the park, where the carousel will be located, is the next phase to begin renovation with an expected completion date of 2004.

**Project Description**:  The carousel is being designed by the architecture firm of Weiss + Yoes and is envisioned as a beacon, attracting people through movement, sound, light and fun.  The aquatic theme recalls New York's first Aquarium that was located in Castle Clinton from 1896 to 1941, when it was moved to Coney Island.  The carousel will feature 30 figures cast in resin representing a selection of marine life that was displayed in the original Aquarium.  The specifications for the aquarium figures are being developed and qualified carousel fabricators are being identified.  Light, sound and other artistic features will also be developed.

Schematic design is advancing along with fundraising efforts for the privately funded feature.  The entire project budget is anticipated to be $1.5 million to $2 million.  Design and fabrication of the figures is estimated to be $10,000 to $20,000 each.

**Artist Selection Process:**  The Conservancy has engaged public art consultant and curator Jennifer McGregor to organize the artist selection process.  An advisory committee has been formed to review the submissions and recommend three to five artists to submit proposals. Finalists will be sent a

comprehensive briefing package and are required to attend a site visit. An honorarium of $1,000 will be awarded to the finalists upon submission of the proposals. The Battery Conservancy will make its final decision based on the advisory committee's comments and recommendations, using the following selection criteria as a guide.

**Selection Criteria**: Artistic Excellence
Ability to work collaboratively with the client, design team and fabricators
Successful experience with comparable projects
Appropriateness and excitement generated by proposed approach

**Calendar**:          Submission Deadline          January 26, 2004
                 Notification of Finalists       late January
                 Finalists Proposals Due         March 19, 2004

**Artist Eligibility:** All professional artists are encouraged to apply. Artists may submit as a team using one application and including up to 10 slides for each team member.

Application Checklist
1. Completed application form that includes the names of two references who can speak about your work.
2. Up to ten 35mm slides of previous work in a plastic slide sheet. Slides should be labeled individually with the artist's name and a number that corresponds with the slide list description.
3. A numbered slide list that indicates the work's title, medium, date, location, name of client or commissioning agency where applicable, and cost.
4. A current resume that includes any commissions that you have received
5. A self-addressed stamped envelope that is large enough to enclose all the submitted materials and has enough postage to cover return mailing.

Please do not send:
- materials larger than 8 1/2 x 11"
- original artwork
- large format transparencies
- video tapes or CD's

Application Deadline January 26, 2004
All applications must be received at the Battery Conservancy's office by 4:00 pm. Late or incomplete applications will not be accepted. Electronic applications will not be accepted. For deliveries by hand, the regular office hours are 9:30 am to 5:30 pm.

Address applications to:          Battery Carousel Project
                           The Battery Conservancy
                           One New York Plaza, Concourse Level
                           New York, NY 10004
                           212-344-3491

**Questions may be addressed to Jennifer McGregor by email jennifermcgregor@earthlink.net or by fax 212-344-3496. Please include a daytime phone number and email address with your query.**

**Battery Carousel Application**

Artist Name:_____

Other team members or collaborators (if applicable):_____

Mailing Address: _____

Telephone: _____    Fax: _____

Email: _____    website: _____

*Use back side or separate sheet if necessary to answer questions*

What interests you most about this project?

What project or experience prepares you most for working on the Battery Carousel?

Names of two people who can speak about your work:

1. _____    phone (___)_____ email _____

2. _____    phone (___)_____ email _____

**Deadline January 26, 2004** - All applications must be received at the Battery Conservancy's office by 4:00pm.  Late or incomplete applications will not be accepted.  Electronic applications will not be accepted.  For deliveries by hand, the regular office hours are 9:30 to 5:30.

**Application Checklist**
- Completed application form
- Up to ten 35mm labeled slides of previous work in a plastic slide sheet
- A numbered slide list with the title, medium, date, location, name of client and cost (if applicable)
- A current resume that includes any commissions that you have received
- An SASE, large enough to enclose the materials and with enough postage to cover return mailing.

> Battery Carousel Project
> The Battery Conservancy
> One New York Plaza, Concourse Level
> New York, NY  10004
> 212-344-3491



Conceptual design by Weisz + Yoes for The Battery Conservancy 2003



Conceptual design by Weisz + Yoes for The Battery Conservancy 2003

# BATTERY CAROUSEL



AQUATIC SPECIES *FOR THE* BATTERY CAROUSEL

**FRESHWATER** · **FISH** · CATFISH · SPADEFISH · SUCKER · HORNED · POUT ·
QUILLBACK · SUCKER · **MARINE** · **FISH** · BLACK · ANGELFISH · BLUE ·
ANGELFISH · FRENCH · ANGELFISH · SQUIRRELFISH · SKATE · PORGY · TRUNK ·
**MAMMAL** · DOLPHIN · MANATEE · **REPTILE** · TURTLE · **INVERTEBRATE** ·
CRAYFISH · STARFISH

EXHIBIT 2

Battery Carousel
Finalist's Proposal Package
February 2, 2004



The
**Battery**
Conservancy

Contents

1. Artist Orientation Outline

2. Artist Participation Agreement and W-9 Form
   **Return immediately!**

3. Drawings
   The Battery: Existing Conditions 2003
   The Battery Master Plan with Bosque Detail 2003
   The Battery Bosque Phase One Final Design Layout Plan 2003
   Weisz + Yoes Carousel Plan, Drawing #1
   Weisz + Yoes Carousel Seating Parameters, Drawing #2
   Rendering of the Battery Bosque Kiosk
   Rendering of the Battery Bosque Fountain

4. Photograph of original Aquarium exterior, 1934

5. Photograph of original Aquarium interior, 1906

6. List of species in the Aquarium

7. Passes to the New York Aquarium

New York Aquarium
Corner of Surf Ave. and W. 8th St.
Brooklyn, NY 11224
(718) 265-FISH

Call for directions

**The Battery Conservancy**
**Marine Life Carousel Figures**
**Artist Orientation Outline**

The Battery Conservancy seeks to commission an artist or a team of artists to design and supervise the fabrication and installation of 26 figures plus 1 chariot for the Battery Carousel. This one-of-a-kind feature is being designed to create the sensation of an underwater experience that recalls the first Aquarium, which was located in Castle Clinton in the Battery from 1896-1941. The Battery Carousel is part of the plan to revitalize the park as a lively, contemporary park that references the phenomenal events and activities that have taken place here.

**Background**: As the birthplace of New York, the Battery's history is colorful and varied. The park is at the confluence of the Hudson and East Rivers where the earliest Dutch settlers landed in 1623, and where the first "battery" of cannons was erected to defend New Amsterdam. Castle Clinton, the circular fort, was built in anticipation of the War of 1812, a decade later it was renamed Castle Garden and was transformed into the city's premier cultural center. By 1855 successive landfills had enlarged the Park to encompass Castle Garden and the structure became America's first immigrant receiving center, welcoming 7 million people before it was succeeded by Ellis Island. In 1896, the Castle was converted into the city's first public aquarium until its partial demolition in 1941. The Battery is also home to a wide array of monuments and memorials beginning in 1817 with the tablet in honor of Fort George.  More information on the Battery's history can be found at www.thebattery.org

The Battery Conservancy, a not-for-profit educational corporation, was created in 1994 to revitalize Battery Park and renew the spirit of Castle Clinton National Monument, the park's major landmark. The Conservancy's goals are to return the Battery to its historic role as a center of downtown cultural life and to create a vibrant urban landscape on the waterfront that honors its heritage and inspires its four million annual visitors.

**The Battery Today**: With 23 acres of waterfront parkland, the historic Battery is the largest open public space downtown. The Battery is the gateway to the New York Harbor and its many cultural destinations. So far, The Conservancy has raised $32 million in public and private funds. This includes the reconstructed Dewey Promenade, opened in 1998; the new Upper Promenade, opened in 2001; the new Battery Bikeway and Gardens; and federal transportation funds allocated for the adaptive reuse of Castle Clinton National Monument. The Conservancy and NYC Parks have worked to improve park maintenance, and, guided by the award-winning 1986 Battery Park Master Plan, have collaborated on rebuilding the landscape.

Other contemporary artworks in the park include *The River That Flows Two Ways*, Wopo Holup's seawall railing, installed in June 2000, that depicts the cultural and natural history of the Battery.  From time to time temporary artworks are sited in the park.

The Battery welcomes over 4 million visitors each year. Tourists from all over the world come to board the ferries to the Statue of Liberty and Ellis Island and take the opportunity to linger. A substantial number of people work or live in the vicinity and come to enjoy the views and open space. Concerts and other programs draw people to the park as well as the restaurant. We expect that the carousel will be a draw for families and all visitors to ride and to watch. As such it must be visually captivating and built to handle continuous use. Plans for ferry service between the Battery and Coney Island, where the New York Aquarium is located, are in discussion.

**Project Description**: The carousel and its enclosure is being designed by the architecture firm of Weisz + Yoes and is envisioned as a beacon, attracting people through movement, sound, light and fun.  It will be interactive and open to the public seasonally, most likely April through October. However, it will be lit at night throughout the year. The proposed location is in the Bosque section between the Coast Guard Memorial and the restaurant.

The aquatic theme recalls New York's first Aquarium that was located in Castle Clinton from 1896 to 1941. The carousel should evoke the experience of swimming with the marine life.  In the early stage of design the carousel is being conceived of as a series of figures rotating around the bearing assembly, a drum wrapped with a panel material that will refer to ocean life and possible scenic panels that do the same. The floor or platform is anticipated to be wood. Surrounding the carousel will be an enclosure that has a shell-like spiral form that accentuates the experience and enables lighting effects and music that enhances the carousel experience. Please refer to the drawings included with this package for more specific details.

**Artist's Scope**: The selected artist will join the team to design the figures. There are other areas of the design where participation is welcomed such as the light, sound, and surface imagery. The carousel will feature 27 figures - 26 sea creatures and 1 "chariot." This is not necessarily an actual chariot, but lower, a stationary figure that is easier to sit on, and increases accessibility to the experience. The diagram included in the package is schematic to show how the figures might be arranged.

The selected artist will help identify the species, their formation and relationship to each other. The list of species in the original Aquarium is included as a reference. We are open to including other species if it fits into your plan. There are many ways that the animals might be represented. While there is an interest in realism, there is considerable need for interpretation since in the natural world the actual animals and plants would not carry humans. There should be an element of fantasy in the experience, but it should not be reliant on cartoon imagery.

Materials:  Traditionally carousels figures were fabricated out of wood. While this is a possible material, the Conservancy has been leaning toward translucent cast resin as a material because of its potential to be "aqueous".  However, we are open to considering other materials.

<u>Figure Specifications:</u> The Weisz + Yoes diagram in this package indicates the specifications for the aquarium figures that are *strongly* recommended.

The selected artist or team will be responsible for design, including presentation models and maquettes and models or prototypes required for fabrication. The Carousel fabricator will be responsible for fabrication and installation. Qualified fabricators are being identified by the Conservancy and the architect.

**Budget**: Schematic design is advancing along with fundraising efforts for this joint public and privately funded feature. The entire project budget is anticipated to be $1.5 million to $2 million. Design and fabrication of the figures is estimated to be $10,000 to $20,000 for each. The artist's budget will be up to $50,000 depending on the final scope of work. The artist's budget will cover:

> Artist Fee
> Office/Studio expenses and labor related to this project
> Presentation drawings and models as required for approvals and fundraising
> Working drawings, models, templates and prototypes as required for fabrication
> Artist's Travel
> Shipping of working drawings, models or prototypes to fabricator
> All Risk Art Insurance

**Artist Selection Process**: A committee has been formed to select finalists and advise the Conservancy on the final selection it includes:

Voting:  Warrie Price, Battery Conservancy
         Ted Berger, New York Foundation for the Arts
         Charlotte Cohen, Percent for Art Program
         Wopo Holup, Artist
         William Castro, NYC Department of Parks and Recreation
Advisors: Tricia Mire, Lower Manhattan Cultural Council
          Suzanne O'Keefe, Downtown Alliance
          Harold Reed, Community Board 1
          Bonnie Koepple, NYC Department of Parks and Recreation
          Jonathan Kuhn, NYC Department of Parks and Recreation
          Deborah Bershad, NYC Art Commission

The Conservancy has engaged art consultant and curator Jennifer McGregor to organize the artist selection process.

<u>Selection Criteria:</u> The Battery Conservancy will make its final decision based on the advisory committee's comments and recommendations, guided by the following selection criteria:

> Artistic Excellence
> Appropriateness, excitement and originality of proposed approach
> Ability to work collaboratively with the client, design team and fabricators

Successful experience with comparable projects

Five finalists (three individuals and two teams) have been invited to prepare proposals following the recommendations below. The proposals will be presented to the Advisory Committee in person on March 23. The artists should be prepared to discuss their design process with the committee. The Conservancy will make the final selection based on the Committee's comments and recommendations. The Conservancy reserves the right to reject all proposals.

A site visit has been scheduled for February 13 at 10:00 am. We will meet at the Conservancy office at 1 New York Plaza, Concourse Level. (Enter at Broad and Water Street and go down the steps to the concourse (basement). To get to the building, take the 1/9 train to South Ferry, the R to Whitehall or the 4/5 to Bowling Green.) This will be an opportunity for you to learn more about the project. Warrie Price, The Conservancy's President, will discuss the carousel and its relationship to the other exciting changes underway in the park.  The architects will be on hand to discuss their vision and experience working with artists. We'll walk to the Battery to see the site.  Any new information presented will be shared with artists who are unable to attend.

**Proposal Submission**:  An honorarium of $1,000 will be awarded to the finalists upon submission of the proposals. This must cover all expenses related to the submission including artists travel. The proposal will remain the property of the artist; however, The Conservancy reserves the right to retain the proposal for up to one year for display purposes, and the right to reproduce it for documentation purposes.

At the conceptual stage the proposals should convey the artist's approach to the project. Please bring 10 copies of any handouts to the meeting for panelists and advisors to study. The proposal should include the following:

1) A visual depiction of your concept that indicates your approach to the project and includes illustrations of several figures as well as the placement
2) A three dimensional small scale model of one figure
3) A written description addressing:
    Approach to the project, concept and preferred materials
    Resumes of all team members

Presentation specifics:  Each finalist will have 30 minutes to present to the panel.  As you prepare for the presentation, please allow at least 10 minutes for questions and discussion with the Committee. In the process thus far, the group viewed six of your slides and was briefed on your initial ideas as expressed in your application. If you wish to refer to previous work, please focus on specific projects or processes that relate to this proposal. A slide projector and a digital projector will be available.  Please let the Conservancy know in advance if you will require this equipment.

A Finalist Proposal Agreement and W-9 Form, enclosed with this package, should be signed and returned to the Conservancy as soon as possible.

**Calendar**:      The schedule is subject to change and the production schedule is dependent on successful fundraising.

| | |
|---|---|
| Site Visit | February 13 |
| Proposal Presentations | March 23 |
| Winner notified | March 25 |
| Cast of one figure fabricated | May |
| Gala Event to Carousel Plan and Figure | June 7 |
| Approvals | Fall, 2004 |
| Fundraising Continues | |
| Fabrication | |
| Completion | 2006 |

**Resources**:  The Conservancy has a binder containing the Zoological Society Bulletins from 1904-1926, these were written by Ida Mellon one of the staff ichthyologists. Contact Danny Zeiger (212-344-3491 x15 or dzeiger@thebattery.org) to schedule an appointment.  The Conservancy's website contains basic historical information. We encourage artists to visit the New York Aquarium, passes are included in this package.

**Considerations for the Selected Artist**

**Contracting**:  The selected artist (or team) will contract with the Battery Conservancy. The carousel will be owned by the City of New York therefore the design approval must follow the standard process that includes reviews by the City of New York Department of Parks & Recreation, Community Board 1, and the Art Commission.

**Gala Presentation**:  The Conservancy intends to unveil the project and boost the fundraising campaign at the June 7 Gala, which will have an aquarium theme.  Creating one life-size figure is part of this plan, which will involve the selected artist's immediate participation.

**Design Development and Final Design**:  It is anticipated that the selected artist will adapt and adjust the design based on comments by the Advisory Committee and the Conservancy.  The artist will also be part of the design team for the carousel and will contribute to the plans for the entire carousel. The design will also comply with specifications provided by the carousel fabricator.

**Fabrication and Installation**:  The carousel fabricator will be responsible to build and install the carousel.  The artist and architect will advise on the fabrication, review test samples and the fabrication progress.

**Relevant Information**

Artists invited to submit proposals:
      Eric Berg, Brian McCutcheon
      Barbara Broughel
      Donald Lipski
      Deborah Ross, Ruth Marshall, Priscilla Denaci Deichman
      Christy Rupp

Questions should be addressed to:
      Jennifer McGregor
      646-344-0978
      jennifermcgregor@earthlink.net
      Please do not contact at Wave Hill unless the matter is urgent.