Margaret K. Pfeiffer (MP4552)
Rita M. Carrier (RC3847)
Susan K. Nash (SN1123)
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.: (202) 956-7500
Fax: (202) 293-6330

*Attorneys for Defendants/Counterclaimants*
The Battery Conservancy and Warrie Price

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
          :
BARBARA BROUGHEL,      :
          :
          :
             Plaintiff,    : No. 07 Civ. 7755 (GBD)
    v.       :
          : ECF Case
THE BATTERY CONSERVANCY,   :
WARRIE PRICE, CLAIRE WEISZ, AND   :
MARK YOES, "DBA" WEISZ + YOES,   :
          :
             Defendants.    :
          :
          :
------------------------------------------------------ x

**DECLARATION OF PATRICIA KIRSHNER IN SUPPORT OF DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR A PRELIMINARY INJUNCTION**

County of NEW YORK   )
State of NEW YORK    ) ss.:

I, Patricia Kirshner, declare as follows:

1. I am Director of Operations & Planning for The Battery Conservancy (the "Conservancy"). I have personal knowledge of the facts set forth in this

|   | Declaration. I make this Declaration in support of the memorandum of law of the Conservancy and Warrie Price in opposition to Plaintiff's cross-motion for a preliminary injunction. |
|---|---|
| 2. | I have been Director of Operations & Planning for the Conservancy since 1999, and I have been involved with the Conservancy's project to build a carousel in Battery Park (the "Carousel Project") since it was conceived in 2003, in my capacity as project manager for the Conservancy on the Carousel Project. |
| 3. | I have personal knowledge of all aspects of the origin and development of the Carousel Project. I have participated in all of the fundraising related to the Carousel Project, and I have been aware, on a contemporaneous basis, of the public relations activities concerning the Carousel Project. My responsibilities for the Carousel Project include participation in all planning and design initiatives, and coordination of the Carousel Project from beginning to final approvals by the New York City Department of Buildings when the Carousel is safe and open for public use. It is also my job to serve as an interface with all relevant agencies and entities involved with the renovation, restoration and operation of Battery Park as it relates to the Carousel. |
| 4. | The initial idea for a moving, lit-at-night carousel was developed at a Battery Park design meeting, held in 2003, as part of the larger post-September 11 revitalization of lower Manhattan. The Carousel was specifically selected for an area of the Park known as the Bosque, which comprises approximately three acres and contains a large grove of London Plane trees. In 2003, the design team was grappling with how to deal with an area of the Bosque that was dark and unlit. |

The lighting designer attending that meeting suggested that some kind of motion with lights -- a lit merry-go-round -- would animate and attract visitors to the area, making it safer and creating an evening destination in the park.  Later, the architects on the team, Weisz + Yoes Architecture (W+Y"), came up with the notion of an aquatic carousel that would recall the original New York Aquarium, which had been located at Castle Clinton in Battery Park from 1896 to 1941.

5. Since the Conservancy terminated Plaintiff from the Carousel Project in March 2007 for non-performance of her contract dated July 12, 2006, the Conservancy has been able to proceed with the development of the design of the Carousel.  Working with new professional carousel sculptors and artists, qualified fabricators, and a professional carousel designer and producer of carousels, we produced a new, rideable prototype.

6. The Conservancy completed a contract with George Tsypin Opera Factory ("GTOF") in January 2008 for the design of the schematic concept of the Carousel.  The Conservancy received this design in February 2008, and accepted it in March 2008.  The Conservancy has paid GTOF for the schematic concept, and has already spent considerable time in seeking approval for the new design, as well as in arranging for additional funds and publicity.  The Conservancy and W+Y are currently negotiating an agreement with GTOF for it to provide the detailed drawings and specifications of the Carousel to be put out for public bid.

7. Adrian Benepe, Commissioner of the New York City Department of Parks & Recreation, has approved both W+Y's design of the exterior structure and the GTOF design.

8. The Financial District Committee of the Conservancy's local community board, Community Board #1, has given the W+Y design of the exterior structure and the GTOF interior design enthusiastic support, and it has drafted a resolution endorsing the Carousel Project and its benefits to the community for presentation and approval to the full Community Board #1. Presentation of these designs to the full Community Board #1 is scheduled for April 22, 2008, to be followed by a presentation to the New York City Art Commission on May 19, 2008. Once these approvals have been obtained, the public phase of fundraising for the endowment for the operation and maintenance of the Carousel will begin.

9. Since March 2007, the Conservancy has continued taking the steps necessary to complete the Carousel Project, including retention of GTOF. The Conservancy has received a proposal to produce a seat and restraint system prototype. The architectural and engineering drawings are eighty to eighty-five percent complete. The Conservancy has retained a contractor to dig test pits and drill borings to collect geotechnical information on the soil structure at the site to complete the foundation and cellar drawings. The samples have been taken and the geotechnical report will be issued shortly.

10. As soon as the approvals described in Paragraph 8 have been received, the final design package will be completed and put out for bid. The New York City Department of Parks & Recreation is in the process of requesting permission from the Mayor's Office of Contracts and the Corporation Counsel to issue a non-standard bid procurement that would separate the criteria for selection of the contractor from the bid price. The qualifications of the contract would be

considered first, and only qualified bidders would have the opportunity to bid on the work. The final selection would be made on the basis of the team that the contractor has assembled, the approach to the work, and cost. The tight schedule calls for having a signed contract with a general contractor and ride fabricator by mid-autumn 2008.

11. The Conservancy is the private, not-for-profit partner of the New York City Department of Parks & Recreation in rebuilding and revitalizing historic Battery Park. It has a substantial role in financing the work on the Battery, including the Carousel Project; it can fulfill that role only by raising funds from contributors. The Conservancy is totally dependent upon its ability to raise funds to fulfill its mission. The Conservancy has raised over $63 million in public funds and $22 million in private funds since 1995 for the overall Battery renovation.

12. An injunction stopping work on the Carousel Project would hurt the Conservancy's ability to raise funds to fulfill its mission. In the years that I have worked for the Conservancy, especially through my role in helping to raise funds, I have come to understand a great deal about the reasons donors give money to the Battery revitalization, as well as why people refuse to donate funds. It is my opinion, based on my experience, that, if it is unable to complete the Carousel Project in a timely way, the Conservancy's credibility as a manager and an entity capable of successfully completing projects will be damaged. This damage will, in my opinion, based on my experience, impair the Conservancy's ability to raise the funds needed to maintain and operate the Carousel, because fundraising is totally dependent on maintaining a quality reputation and demonstrating the

ability to complete projects successfully. If ongoing relationships with current private and public donors for the endowment for the operation and maintenance of the Carousel, or our ability to develop new donors, are hindered, the Conservancy will find it difficult to raise adequate funds to complete and operate the Carousel.

13. Funding for the construction of the Carousel is in hand. This consists of $8 million in public monies from the Lower Manhattan Development Corporation, the New York City Council, the Manhattan Borough President, the Mayor's Office, and the Lower Manhattan Cultural Council. This funding is contingent upon entering into contracts with construction fabricators during the terms of office of these funders, because funds allocated by this Mayor and City Council may not last past expiration of their terms of office in 2009. Thus delays in completing the project threaten the Conservancy's ability to hold onto the construction funds.

14. The Conservancy's experience has been that, if the funds allocated by City agencies are not used, or the contract commitment to expend the funds is not finalized, the funds will disappear. This has already happened due to earlier delays in the start up of another project. The Conservancy lost $1 million in Manhattan Borough President funds for the Perimeter Bike Way project. The funds were raised in 2002. Unfortunately, the start of the project was delayed, and, although the funds were initially carried over from one fiscal year to the next, each fiscal year they were decreased. When the administration that had allocated the funds left office, the allocated funds were entirely removed from the City budget.

-7-

15. Delaying the progress of the Carousel Project could also cause the Conservancy to lose its rights to the new design of the Carousel that GTOF has created. The contract between the Conservancy and GTOF provides for a limited period in which the Conservancy and GTOF can negotiate an agreement for the production of the new design construction drawings and construction supervision. This limited period may be extended by agreement of the parties. There are no assurances that GTOF would agree to extend the negotiation period if an injunction halts the project significantly.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct. Executed on this 14th day of April, 2008.

_____
Patricia Kirshner