BARBARA HOFFMAN (BH 8931)
The Hoffman Law Firm
330 West 72nd Street
New York, New York  10023
(212) 873-6200  (phone)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA BROUGHEL<br><br>                    Plaintiff,<br><br>          v.<br><br>THE BATTERY CONSERVANCY, WARRIE PRICE, CLAIRE WEISZ AND MARK YOES, "DBA" WEISZ + YOES<br><br>                    Defendants. | No. 07 Civ. 7755 (GBD)<br><br>ECF Case |

## DECLARATION OF DALE MARTIN LANZONE IN SUPPORT OF PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR A PRELIMINARY INJUNCTION

I, Dale Martin Lanzone hereby declare, pursuant to the penalties of perjury under 28 U.S.C. 1746 that the following statements are true and correct.

1. My full resume with credentials is attached hereto as Exhibit 1.  I am President of International Public Art Ltd. since 9/1/1996.  In that capacity, I often work with Marlborough Gallery and other artists in the development and implementation of art projects, sales, exhibitions and other art related matters.  I work extensively in developing and obtaining private and public commissions for the artists as well as assisting in contract negotiations, fabrication, installations and exhibitions.

2. I was the Director of Cultural and Environmental Affairs, General Services Administration (GSA), Public Buildings Service (4/10/87 - 7/21/96) in Washington, DC. I had overall national responsibility for the acquisition, maintenance and conservation of contemporary American art for U.S. Government buildings managed by the General Services Administration. Additionally, I administered the General Services Administration's Historic Preservation Program which consisted of 900 buildings, a fine arts collection encompassing 9500 works of art, the agency's archeological programs, environmental quality program under the National Environmental Protection Act and those programs administered under the American Disabilities Act. I managed 16 professional staff members in Washington, directed two staff members in each of GSA's 11 regions, 2 contracted architectural firms, projects at Georgia Technical University and projects jointly managed by the National Park Service. Projects ranged in scale and complexity from a $11 million archeological project at the Foley Square Federal Office Building site in New York, NY to $3 million in art commissions for the International Trade and Cultural Center in Washington, D.C.

3. I was Special Assistant to the Director for the National Park Service, Washington, DC. I acted on behalf of and advised the Director and Deputy Director on all facets of National Park Service operations and activities (11/81/10/87).

4. I was Special Assistant to the Assistant Secretary for Fish and Wildlife and Parks for the Office of the Secretary of Interior, Washington, DC. I advised and assisted the Assistant Secretary in all facets of National Park Service operations and activities (5/85 - 11/85).

5. Special appointments include: (1) President's Advisory Council on Historic Preservation, Washington, DC, by the Administrator of the General Services Administration (4/94 - 7/95); and (2) President's Committee on the Arts and Humanities, Washington, DC,

serving as committee member representing the Department of the Interior and the General Services Administration (6/85-7/95).

6. Based on my years of experience in the public art field and experience in working both with public and private commissions for large-scale publicly accessible projects, I am fully familiar with the customs and practices in the field and the contracts that are used by many responsible professional arts administrators and public agencies which commission works of art. I submit this Declaration to put before the Court a certain standard public art agreement. The purpose of this agreement is to indicate the general terms which are often included in such contracts. Of course, every contract is negotiated and artists with more bargaining power than others will have greater say in their ability to negotiate a contract. Attached hereto as Exhibit 2 is a contract prepared by the New York City Bar Association in 1985 and which is a model on which many public arts contracts continue to be based (the "Model Contract").

7. The Model Contract is submitted to support my Declaration on custom and usage in the public art field and to illustrate what might be called the general structure that is normally applied when an artist is selected to participate either through a percent for art program or another competition in a public art project. The Model Contract is based on a single artist for a fixed fee project with the artwork fabricated offsite. Nevertheless, it's "boiler plate" applies to other typologies of public art commissions. The relevance of the Model Contract will be developed in subsequent paragraphs.

8. I have also been shown and considered the following documents attached as Exhibits 3 and 4, A Call for Artists and the Artist Orientation Outline ("Artist Orientation Outline") that were used in the Competition to select the Plaintiff for this Project. I understand that the Plaintiff was selected as a finalist and that subsequently she won the competition based

3

on her proposal. I also understand that her proposal was refined and submitted to the Commissioner of Parks and Recreation, Community Board Number One, and the New York City Arts Commission, which approved the Proposal. I have been asked to give an opinion on what the common understanding in the field would be with respect to Exhibits 3 and 4, as they relate to the commission process.

       9. Of particular note with respect to the Artist Orientation Outline are the considerations for the selected artist.

> **Considerations for the Selected Artist**
>
> **Contracting**: The selected artist (or team) will contract with the Battery Conservancy. The carousel will be owned by the City of New York therefore the design approval must follow the standard process that includes reviews by the City of New York Department of Parks & Recreation, Community Board 1, and the Art Commission.
>
> **Gala Presentation:** The Conservancy intends to unveil the project and boost the fundraising campaign at the June 7 Gala, which will have an aquarium theme. Creating one life-size figure is part of this plan, which will involve the selected artist's immediate participation.
>
> **Design Development and Final Design:** It is anticipated that the selected artist will adapt and adjust the design based on comments by the Advisory Committee and the Conservancy. The artist will also be part of the design team for the carousel and will contribute to the plans for the entire carousel. The design will also comply with specifications provided by the carousel fabricator.
>
> **Fabrication and Installation:** The carousel fabricator will be responsible to build and install the carousel. The artist and architect will advise on the fabrication, review test samples and the fabrication progress.

It is my opinion that the Artist Orientation Outline sets out a framework of terms and or requirements that the Artist should expect to be present in the contract between the artist and the client the Battery Conservancy and that the artist could reasonably expect if selected in the competition to participate as a member of the design team to effectuate her proposal subject to

4

various approval steps to be set forth in a contract to be more fully negotiated between the artist and the Conservancy following the artist selection.

      10. There is a reference to a budget and certain fees in the Artist Orientation Outline. Understandably budgets are often tentative and subject to change based on the ability of the commissioning body to raise the money unless it is a percent for art project, in which case the budget is a legislated percent of the capital expenditures on the project for the arts budget. In government percent based public art projects there is often an artist's fee established as a budget line item as a percent of the total commission. In other cases, an Artist may be a contracted for a fixed sum (without separating out the Artist's fee) to create a specific proposed work of art. In such cases the market value of the Artist's work is usually well established and the commissioning body confirms through comparable sales or commissions that the proposed work of art's market value is equal to or exceeds the commission amount. When a commission includes a separate artist's fee, the artist's fee can vary based upon the size and complexity of the project, but in many public projects the standard fee proposed by the commissioning body is 20% of the allocated art fabrication budget or art construction budget subject to the artist's working drawings. There are many exceptions to this standard, for example an artist may only be required to do a few drawings that are subsequently developed into a final work of art by others, in such cases the artist's fee could be negotiated. In other instances the artist may spend months or even years of personnel and studio time creating a work of art. Fees for such work are also often negotiated based on a number of variables.

      11. I have also been asked to opine on the possible harm and injury to an artist who is wrongfully terminated from a project so highly visible as the Sea Glass Carousel in Battery Park.

The reason that the Model Contract and the General Services Administration Art In Architecture contract ("GSA Contract"), which was used by my former agency, provide a detailed structure for review is to assure that no artist is removed from a project at the whim of a single individual or for other arbitrary and capricious reasons. These contracts and other public art contracts typically, establish fair procedures for review and approval of the artist's work, so that no artist is wrongfully terminated from a project. If termination for cause is alleged, the artist is notified in writing of the specific faults, given an opportunity to offer remedies or correct the faults, or under certain circumstances, to appeal the determination of fault.

      12. I have also been asked to opine on the potential irreparable injury suffered by an artist who is wrongfully terminated. Following common due diligence procedures, a public art administrator will research an artist's project performance history. If an artist has been terminated from a previous project, there may often be a "ripple effect" and the likelihood of additional projects is diminished. More than half of the public art commissions are selected by panels who will review an artist's past background and be aware of an artist's projects as well as an artist's removal for fault from any projects. Notwithstanding that an artist may continue to have a successful selling career through a gallery, the harm to an artist to obtain public art commissions based on accusations of fault or default cannot be quantified in money damages alone.

      13. I understand that the Plaintiff has argued, and I agree, that a defendant's action in terminating an artist from a contract will have a real but incalculable effect on an artist's status and ability to compete for private and public art commissions. Based on my experience, it is my opinion that such damages may not be calculated over the reasonable life of a contract with relative certainty.

14. I have spent a career dedicated to the belief that the creation of public art is a product of meaningful and vital collaboration between artists and public decision-makers. In my experience, such collaborations only work to the public's benefit when there is an open exchange of ideas, means and methods between the artist and the decision makers. Without such a collaboration and the mutual respect it should engender the creative process often stumbles, sometimes fails. Public decision-makers will continue, as they have historically, to embrace art that elevates and refreshes the common moment of experience with a kernel of awe and wonder — some small magic that transforms the everyday eye, mind and object through the efforts and vision of another. The artist's vision that performs this function will be embraced by the public and receive encore, after encore — we must work for this outcome, above all else we must care, trust and respect.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on May 8, 2008
in New York, New York.

_____
DALE MARTIN LANZONE