# EXHIBIT 2

# COMMISSIONING A WORK OF PUBLIC ART:

# AN ANNOTATED MODEL AGREEMENT

© Association of the Bar of the City of New York,
Committee on Art Law, 1985  All Rights Reserved

In recent years, federal, state and various municipal governments, as well as private corporations and real estate developers, have become more active in commissioning works of fine art for temporary or permanent exhibition in public places. Such commissions have become larger in terms of scale, cost and complexity of fabrication and installation.  Artists have been asked to participate, often in collaboration with other design professionals, in developing innovative solutions to public design problems in such areas as building design and park development.  It is thus not surprising that the experience and skills of lawyers have been increasingly called upon in the preparation of the contractual documents governing these projects.

Each project is necessarily unique in its particular public/private sector involvement, matching funds participating, timing and scheduling, formalities for review and acceptance of the proposed work and the finished, installed work, not to mention the apportionment of the burdens of obtaining and paying for materials, labor (including labor union involvement at installation), site preparation work and insurance coverage, to name a few common considerations.

Thus, it would be folly to propose that a single form of agreement be used for all projects.

Nevertheless, all public art projects do have certain aspects in common.  They all involve creative work by an artist under circumstances in which the integrity and authenticity of the artist's creation must be assured throughout the often lengthy and costly process of fabrication and installation, and beyond installation to the period of exhibition, maintenance and repair of the work of fine art.

In addition, the high visibility of public art works has tended to engender community reaction and strong controversy, particularly as the contemporary public artist engages new forms and symbols unfamiliar to the taste and culture of the community served.  As George Segal, a noted sculptor, stated in discussing the difference between private and public commissions: "Now I have to take public feelings into account...  The question is whether you can maintain the density of your subject matter at a decently high level of thinking, and still be accessible to a lot of people."  Partners for Livable Places, Art in Public Places, 1981 at 75.

Because the considerations of securing artistic integrity and public accommodation are not commonly found in other public works construction agreements, they often give rise to concern on the part of attorneys and their clients who are unfamiliar with them.  The Model Agreement is proposed in the hope that it will elucidate some of these issues, both for legal practitioners and their clients.

The  Model Agreement incorporates those aspects of public art contracts that have already acquired a history in negotiation and utilization in actual case situations.  Our objective has been to strike a balance of fairness based on our experience in negotiating such contracts, between the legitimate concerns of an artist who desires to obtain a commission and realize a work that enhances the artist's reputation and a commissioning body conscious of its responsibility to ensure that a project of quality is realized.

In the interest of clarity, we have chosen as our typical situation one of the simplest: an agreement between a municipality that wishes to commission a work of art and an individual artist who will be responsible for all aspects of the conception, creation, fabrication and installation of the finished work.

We have assumed for purposes of the Model Agreement that a municipality, subject to a "percent for art" requirement that a certain percentage of capital construction costs for public buildings be dedicated to fine arts, wishes to retain an individual artist to conceive, propose, fabricate and install a particular work of art.  The commission method is used as distinct from the direct purchase of an existing artwork or the selection of the artist on the basis of the submission of a competitive proposal.  The commission method involves the selection of the artist to create a new work on the basis of a prior portfolio. The commission method can have the advantage of creative participation and involvement for the construction o project architect, the contracting agency, the arts commission and the public since no product exists at the time of the commission; on the other hand, the hazards of communication and creative process referred to above are increased.

The Model Agreement also assumes for purposes of simplicity, that the artist will fabricate the major part of the work in a studio or foundry.  It does not provide for an elaborate construction phase, which would involve the artist in on-site supervision in order to insure that the work is executed in a professional and workmanlike manner and in accordance with the original design.

Thus, the Model Agreement does not deal with many common situations:

1.    We have not attempted to deal with the situation in which an artist may utilize a corporation to undertake some or all of the responsibilities of carrying out a public art project.  For instance, a commissioning body concerned that an individual artist may die or become physically incapacitated during the fabrication and installation phases of a project might require that the artist establish or retain a corporation or provide for

some other successor to assume the fabrication and installation obligations, after the artist's death or incapacitation.  Similarly, an artist concerned about his personal individual contractual or tort liability in case of loss or damage to the work in process (or injury cause to others by materials or fabrication/installation activities) may wish to avail himself of the limited liability of the corporate form, at least with regard to the non-conceptual aspects of the artist's services.

Some artists have joined together in corporate or partnership form to produce collaborative works of public art and, in an increasing number of cases, artists' tax situations will suggest the appropriateness of using a corporation to carry out the bulk of a complicated public art project.  Since the decision of whether or how to use a corporation to participate in a public art project will depend on the circumstances, we do not suggest any apportionment of services between an artist and a corporation to fulfill the artist's role in the project described in the Model Agreement.

2.      Often, a major public or private construction project will delegate to the architect, engineer, general contractor or landscape architect for the entire project the task of selecting and integrating into the project design a significant work of fine art by an outside artist.  In such cases, the artist is customarily retained as a consultant under a contract entered into between the artist and the architect, engineer or landscape architect, with contract is in turn made subject to the various prior agreements in force between the overall project developer and the professional retaining the artist.  Although the structure of such a contract will vary from the Model Agreement, many of the issues reflected in the Model Agreement will be relevant.

3.      Some public art projects have involved commitments of resources (materials, labor, organization and scheduling) beyond those available to the artist retained to conceive the work of art.  In such instances, the role of the artist (or his corporation) is often limited to one of the conception, design, site supervision and consultation to ensure that the construction of the art work conforms to the artist's design. The preparation of the site, acquisition and transportation of materials and management of installation labor are essentially performed by the commissioning body.  Such a situation may be vastly simpler or substantially more complicated than the classic public art project described in the Model Agreement.

Even in our simple "model" public art situation, we have been obliged to provide alternative texts for certain items, such as the system of providing compensation to the artist.  In one instance – insurance coverage – we have respected the always unique character of that question by omitting both the form and the substance of insurance coverage requirements to be imposed on either the commissioning body or the artist.

The issues raised and annotated in the Model Agreement also are applicable when a private or public foundation, private corporation or real estate developer commissions a work of art for a public space.

As indicated above, the Model Agreement incorporates clauses of public art contracts that have already acquired a history in negotiation and utilization.  During the eighteen-month period involved in the preparation of the Model Agreement, we have reviewed numerous commission agreements, discussed the Model Agreement with other lawyers, art administrators and artists, and relied on our own experience and expertise in order to arrive at a balanced agreement which takes into consideration the needs of the

artist, the public and the commissioning body.  Given the diversity of contemporary

public art projects and the varying character and goals of commissioning bodies, it is

clear that not every clause in the Model Agreement is essential or appropriate to every

situation.  Further, some clauses will become an element in the bargaining process and

whether they are included or modified will be a function of the price paid for the artwork.

The clauses we have placed in brackets are most likely to change as a function of the

nature of the work, the nature of the project, and the bargaining process.

    We should like to express our gratitude to those who took time to comment on the

Agreement, as well as to the law firm of Paul, Weiss, Rifkind, Wharton & Garrison,

without whose word process support this project would not have been realized.


Committee on Art Law
Neal M. Albert, CHAIR

Stanley M. Ackert[*]                                    Barbara Hoffman[**]
Catherine A. Bostron[*]                                 Edward C. Marschner[*]

---

[*] Members, Subcommittee on Public Art

[**] Chair, Subcommittee on Public Art

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| Article 1 | Scope of Services | | 13 |
| | Section 1.1 | General | 13 |
| | Section 1.2 | Proposal | 14 |
| | Section 1.3 | Structural Design Review | 20 |
| | Section 1.4 | Execution of the Work | 22 |
| | Section 1.5 | Delivery and Installation | 25 |
| | Section 1.6 | Post-Installation | 26 |
| | Section 1.7 | Final Acceptance | 28 |
| | Section 1.8 | Risk of Loss | 29 |
| | Section 1.9 | Indemnity | 30 |
| | Section 1.10 | Title | 31 |
| | Section 1.11 | Ownership of Documents, Models | 31 |
| Article 2 | Compensation and Payment Schedule | | 33 |
| | Section 2.1 | Fixed Fee | 33 |
| | Section 2.2 | Sales Taxes | 35 |
| | Section 2.3 | Artist's Expenses | 35 |
| [Alternative Article 2] | | | 35 |
| [Article 2] | Compensation and Payment Schedule | | 35 |
| | Section 2.1 | Preliminary Design Proposal | 35 |
| | Section 2.2 | Further Agreement | 36 |
| | Section 2.3 | Addendum | 36 |
| Article 3 | Time of Performance | | 37 |
| | Section 3.1 | Duration | 37 |
| | Section 3.2 | Construction Delays | 37 |
| | Section 3.3 | Early Completion of Artist Services | 38 |
| | Section 3.4 | Time Extensions | 38 |
| Article 4 | Warranties | | 39 |
| | Section 4.1 | Warranties of Title | 39 |
| | Section 4.2 | Warranties of Quality and Condition | 39 |

Article 5          Insurance......................................................................    42

                  Section 5.1...............................................................    42
                  Section 5.2...............................................................    43


Article 6          Reproduction Rights......................................................    45

                  Section 6.1...............................................................    45
                  Section 6.2...............................................................    45
                  Section 6.3...............................................................    46
                  Section 6.4...............................................................    46

Article 7          Artist's Rights.............................................................    49

                  Section 7.1      Identification.......................................    49
                  Section 7.2      Maintenance.........................................    50
                  Section 7.3      Repairs and Restoration.......................    51
                  Section 7.4      Alteration of the Work of the Site.........    52
                  Section 7.5      Permanent Record................................    54
                  Section 7.6      Artist's Address....................................    54
                  Section 7.7      Surviving Covenants............................    55
                  Section 7.8      Additional Rights and Remedies...........    55
                  [Section 7.9     Resale Royalty]....................................    57


Article 8          Artist as Independent Contractor....................................    58

Article 9          Assignment, Transfer, Subcontracting.........................    59

Article 10         Termination..................................................................    60

Article 11         Contract Administrator.................................................    62

Article 12         Non-Discrimination......................................................    63

Article 13         Compliance..................................................................    63

Article 14         Entire Agreement.........................................................    63

Article 15         Modification.................................................................    63

Article 16         Waiver.........................................................................    64

Article 17         Governing Law............................................................    64

Article 18     Heirs and Assigns...............................................................     64

Article 19     Arbitration........................................................................     64

Article 20     Notices.............................................................................     66

## AGREEMENT FOR COMMISSION OF PUBLIC ARTWORK

### AGREEMENT BY AND BETWEEN
### THE CITY OF _____ AND _____

THIS AGREEMENT, entered into this ____ day of _____, 20___, by and

between the City of _____ (the "City"), acting by and through the

_____ Art Commission (the "Commission") and _____ (the

"Artist") residing at _____.

   WHEREAS, the City is implementing a public art program pursuant to

_____ [local ordinance or funding source] by allocating

certain funds for the establishment of artworks in public places and authorizing the

making of payments for the design, execution, fabrication, transportation and installation

of works of art and the support of an artist-selection process; and

   WHEREAS, the City Department percent-for-art funds have been allocated for

the selection, purchase and placement of artwork; and

   WHEREAS, the Artist was selected by the City through the procedures duly

adopted by the Arts Commission to design, execute, fabricate and install a [three-

dimensional] work of art (the "Work") in a public space located at [locality] described as

set forth in Exhibit ____ hereto (the "Site"); and

   WHEREAS, both parties wish to promote and maintain the integrity and clarity of

the Artist's ideas and statements as represented by the Work;

   NOW, THEREFORE, the City and the Artist, for the consideration and under the

conditions hereinafter set forth, agree as follows:

Article 1.       Scope of Services

    1.1    General.

        a.       The Artist shall perform all services and furnish all supplies, material and equipment as necessary for the design, execution, fabrication, transportation and installation of the Work at the Site.

        b.       The Artist shall determine the artistic expression, scope, design, color, size, material, texture and [location on the site] of the Work, subject to review and acceptance by the City as set forth in this Agreement.

**Annotation**

    Paragraph (a) of this Section describes the more tangible aspects of the Artist's services.  If the Artist is to perform only some, and not all, of these services, the interaction between the Artist and others should be specified.  For example, this provision could define the roles of the architects, engineers or landscape architects retained by the commissioning body and the manner in which the commissioning body will assure that those professionals coordinate effectively with the Artist to avoid delay or confusion.

    Similarly, if some of the supplies, material, equipment, fabrication, transportation or installation work are to be provided by the commissioning body or agents or contractors designated by it (or by another party to the project), the respective roles of all participants should be clearly defined and linked.

    A provision like paragraph (b) reserves to the Artist the artistic, aesthetic aspects of the services, subject in each instance to the review and acceptance prerogative of the commissioning body.  The Model Agreement includes location on the Site as one of the artistic elements. While the Site will be predetermined by the commissioning body, increasingly, artists are being asked to collaborate in the design of the space for their artwork.  For example, the design for the New York Batter Park City's 3.5-acre waterfront plaza was a collaborative effort between the City's architect Cesar Pelli, landscape architect M. Paul Friedberg, and artists Siah Armajani and Scott Burton.  "We wanted to redefine the traditional role of artist and architect in the design of public spaces," said Richard A. Kahan, Chairman of the Battery Park City Authority.  "We

wanted artists to actually design space and not be assigned spaces in which to do pieces of art." (*New York Times,* December 1, 1983).

1.2  Proposal.

a.    As promptly as possible after the execution of this Agreement, the Artist shall carry out such reasonable site inspections, interviews and research as may be necessary, including meetings with the [City Department] and the project architect, in order to prepare a design proposal for the Work (the "Proposal"). The City shall make available to the Artist the necessary background materials and information on matters affecting the Site and installation of the Work including, where applicable, a written program of requirements and specifications for the Work and the plans for the underlying capital project ("the Project"). It is the intent of the parties that the City and the Artist shall establish a close and cooperative consultation throughout the duration of this Agreement.

b.    The City will arrange for the Artist to meet with representatives of the community in order for the Artist to learn of their concerns.

c.    [If such inspections, interviews, research and meetings as provided for in paragraphs (a) and (b) require more than [three (3)] trips by the Artist to the [locality] before approval of the Proposal, the City shall promptly reimburse the Artist's reasonable expenses for travel and lodging on additional trips.]

d.    Within ninety (90) days after the execution of this Agreement, the Artist shall prepare and submit the Proposal to the City. The Proposal shall specify such materials, dimensions, weight, finish and preliminary maintenance recommendations and proposed installation method and include [drawings and other documents and models] as

are required to present a meaningful representation of the concept and design of the proposed work.  The Proposal shall include a budget, not to exceed $_____, that includes estimated costs for design, execution, fabrication, transportation and installation and the Artist's fees.

       e.      The City shall, within thirty (30) days following the next regularly scheduled Commission meeting after the Artist's submission of the  Proposal, notify the Artist whether it approves or disapproves the Proposal.  During this period, the Artist shall be available as reasonably required to meet with the City to discuss the Proposal.

       f.      If the City shall determine that the Proposal is disapproved, it shall provide the Artist with a statement in writing of its reasons for such disapproval.  In such event, the Artist shall be afforded an opportunity either to submit a second Proposal for the Work within a reasonable period of time specified by the City, or to terminate this Agreement.  Within thirty (3) days following such submission by the Artist, the City shall notify the Artist in writing whether it approves or disapproves Proposal.  If the City shall determine that the second proposal is disapproved, it shall provide the Artist with a statement in writing of its reasons for disapproval, whereupon this Agreement shall terminate.

       g.      In the event of termination of this Agreement pursuant to paragraph (f), the Artist shall retain the Proposals and all compensation theretofore paid, and neither party shall be under any further obligation to the other in respect of the subject matter thereof.

**Annotation**

The most important practical contribution of a written contract for public art is found here: the clear, step-by-step description of the process for the conception and approval of the design of the proposed work.

Experience suggests that the following elements should receive special attention:

(a)     The need for close cooperation and a full exchange of information regarding the Site, the Underlying Capital Project (the "Project"), all scheduling and the respective roles of all participants in the Project.  To the extent possible, the Model Agreement attempts to provide close interaction between the architect and the Artist and where appropriate, a true collaboration in the design process at the earliest time.

(b)     The manner in which the Artist is expected to familiarize  himself with community and user concerns.  Any specific representations regarding the way in which those concerns are to be reflected in the proposed Work should be stated here.  Much of the public controversy surrounding public art has occurred because of inadequate communication between the Artist and his clients, i.e., the Agency and the community.  One of the unresolved issues in public art is the definition of that community.  Since much contemporary art is based on an iconography that is not widely shared, it is suggested that only with public involvement and participation from inception to dedication can the art become accessible to the public it serves.  The success of public art must be related, in part, to the power of the work to generate public response and a dialogue of meaning.  The public should be invited to experience, discuss and grow with a given project.

(c)     The Artist is at this stage engaged in studying and preparing a creative proposal; he or she should be required to spend inordinate time and resources in repeated meetings and trips to a distant city. A provision for the commissioning body to bear the expenses incurred by the Artist (or even to pay a per diem for his time), beyond an agreed reasonable number of meetings and trips, would be normal.

(d)     The content of the proposal to be submitted.  A proposal can be a simple paragraph of writing describing the work, or it can be an elaborate combination of budget, three-dimensional scale model, engineering drawings, artists' renderings, environmental impact statements, and other expensive features designed to assist the

commissioning body in presenting the proposal to its own constituents (e.g., a City Council, a corporate board of directors, or a community hearing). For the usual public art project, the initial proposal includes merely schematic drawings (not drawn to scale), perhaps a simple maquette for three-dimensional works and, as regards a budget, rough estimates of materials costs, labor expense, and transportation, installation and insurance costs, with the remainder of the total estimated compensation allocated as to the so-called "Artist's fee."

It should be kept in mind that the Proposal submitted is the complete focus of the approval process. This means that the finished work must faithfully reflect the proposal, unless the areas of subsequent creative leeway reserved for the artist are clearly reflected in the proposal itself.

It is extremely useful for the commissioning body and for the artist that the proposal include a written description of the aspects of the proposal that may change as fabrication and installation go forward. For example, the Proposal should, if appropriate, contain a caveat that the colors, texture, dimensions, materials and scale of the finished work may depart significantly from those indicated in the proposal.

Providing such a caveat permits both parties to avoid disagreements in the future regarding elements of the work that the commissioning body deems to be essential to its approval of the proposal. The artist should also specific at the time of the proposal certain elements of the work he or she considers as integral elements which may not be readily apparent to the commissioning body, such as lighting for the work or site.

The commissioning body may wish to develop a standard proposal format.

(e)     The commissioning body is afforded a reasonable period of time to consider the Proposal. It is required to state in writing its acceptance or refusal of the proposal and, in the case of refusal, to specify its reason. The time allotted for consideration of the proposal by the commissioning body will depe3nd on how unwieldy the commissioning body's internal procedures are. The Model Agreement contemplates an active Art Commission with a regular schedule of meetings to review proposals for public art projects. In other circumstances, a fixed time period of thirty, sixty of ninety days is usually adopted so that the artist will not be left

dangling while waiting for a response to a proposal in which he or she has invested a great deal of time and expense.

(f)     In the event of disapproval of the proposal, the artist is offered another (and sometimes two) opportunities to resubmit either the same proposal or an entirely new proposal to take account of the reasons for the earlier refusal.  Usually, the time periods for the artist's submission of the revised proposal, and for the commissioning  body to review it, are substantially shorter than the time periods provided for the initial submission.

Unless the artist has received a installment on his or her fee at the time of submission of the initial proposal, the artist during this period is working from the initial installment of compensation. This means that he or she will have to anticipate in doing the first proposal that he or she may have to go through the time and expense of preparing a second proposal if the first is refused.

The artist should have the right to decline to prepare a second proposal, thereby causing termination of the agreement, if he or she feels that it would be too costly or, based on the reasons stated by the commissioning body in its refusal, a new proposal would not be accepted either.  The commissioning body should not have the right to prevent a second proposal, but it should not be required to spend a very long period of time waiting for it and then reviewing it, since the commissioning body may wish to offer the public art project to another artist if it finds the first proposal entirely unacceptable.

(g)     The consequences of acceptance and refusal of the proposal at each step should be clearly set forth.

1.3     <u>Structural Design Review.</u>

a.      Within ___ days after the City approves the Proposal, the Artist

shall [, after consultation and collaboration with the project architect,] prepare and submit

to the City detailed working drawings of the Work and the Site, together with such other

graphic material as may reasonable be requested by the City in order to permit the City to

carry out structural design review and to certify the compliance of the Work with

applicable statutes and ordinances. The City [and the project architect] shall furnish to the Artist all information, materials and assistance required by the Artist in connection with said submissions by the Artist promptly on the request by the Artist for such information.

       b.      The City may require the Artist to make such revisions to the Proposal as are necessary for the Work to comply with applicable statutes, ordinances or regulations of any governmental regulatory agency having jurisdiction over the project.

       c.      The City also may request revisions for other practical (non-aesthetic) reasons.

       d.      The Artist's fee shall be equitably adjusted for any increase or decrease in the Artist's cost of, or time required for, performance of any services under this Agreement as a result of revisions made under this Section 1.3. Any claim of the Artist for adjustment under this paragraph must be asserted in writing within thirty (30) days after the date of the revision by the Artist.

       e.      Within _____ days after its receipt of the Artist's submission pursuant to this Section 1.3, the City shall notify the Artist of its approval (or disapproval) of such submission and of all revisions made in the Proposal as a result thereof. Revisions made pursuant to this Section 1.3 become a part of the Proposal.

### Annotation

It is time-consuming and expensive for an Artist to prepare the initial Proposal. It is usually too burdensome to ask the Artist at that stage, when the Proposal has not yet been accepted even in principle, to engage the additional expense involved in preparing engineering drawings drawn to scale, permitting the commissioning body to evaluate the problems of integration of the Work into the Site and to coordinate the installation work with schedules for site preparation and other adjacent construction.

The Model Agreement reflects the common requirement that such detail work be reserved for <u>after</u> presumably received a second installment of his fee to help him meet the expenses of detail planning.

The compensation provisions of the Agreement should be generous enough in the early installments to permit the Artist to pay his professional architect and engineer advisors for their services in preparing detail drawings.

The schedule of submissions of detailed drawings and specifications should be clearly delineated, with time periods that are expected to be respected by both the Artist and the commissioning body.

The consultation with the project architect initiated in the preliminary design phase should continue.  In projects where the commissioning body will be primarily responsible for implementing construction of the Work, the Artist will not be responsible for the preparation of detailed structural drawings but only required to approve the documents prepared by the engineer and architect t assure that the final construction conforms to his design.

    1.4    <u>Execution of the Work.</u>

a.  After written approval of the submissions and revisions made pursuant to Section1.3, the Artist shall furnish to the City a tentative schedule for completion of fabrication and installation of the Work, including a schedule for the submission of progress reports, if any.  After written approval of the schedule by the City, the Artist shall fabricate, transport and install the Work in accordance with such schedule.  Such schedule may be amended by written agreement between the City and the Artist.

b.      The City shall have the right to review the Work at reasonable times during the fabrication thereof.  The Artist shall submit to the City progress reports in accordance with the schedule provided for in Section 1.4(a).

c.      The Artist shall complete the fabrication and installation of the Work.

d.    The Artist shall present to the City in writing for further review and approval any significant changes in the scope, design, color, size, material or texture of the Work not permitted by or not in substantial conformity with the Proposal.  A significant change is any change in the scope, design, color, size, material, texture or location on the Site of the Work which affects installation, scheduling, site preparation or maintenance for the Work or the concept of the Work as represented in the Proposal.

### Annotation

The importance of the completion schedule referred to in paragraph (a) above cannot be overemphasized.  Any time parameters within which the schedule must fit should be clearly specified in the commission agreement.  All other parties involved (such as the architect) should be consulted in the formulation of the schedule.  The Artist should send copies of the schedule to all parties involved.

Many commissioning bodies will not require written progress reports or the right to visit the Work during fabrication, as provided in paragraph (b).  If requested, however, do not so unduly burden the Artist as to delay his completion of the Work.

Paragraphs (c) and (d) reflect the need for leeway to the Artist as the creative process goes forward, while assuring the City that the Proposal as approved is executed.  The Artist must execute the Work in substantial conformity with the Proposal.  Minor changes as the Work progresses are permitted; however, significant changes which affect installation scheduling site preparation and maintenance for the Work and the concept of the Work require further written approval of the City.

An example of the type of controversy which paragraphs (c) and (d) are concerned with was that surrounding the creation of a public art commission in San Francisco in 1981.  Robert Arneson was chosen in a competitive process to execute a bust of the assassinated Mayor George Moscone for the Moscone Convention Center.  All of the nationally-known artists who competed were asked to submit a sketch "sufficiently detailed so that judgment can be made."  Arneson's preliminary design showed a broadly smiling head on an unadorned pedestal.  In the final work, the artist embellished the pedestal with biographical notes.

Most controversial was the imprinting of a Smith and Wesson revolver, the bloodlike splatters of red glaze and the inscription, "Twinkie," referring to a novel defense raised by the assassin. There was uniform approval of the design and execution of the portrait likeness, but strong criticism regarding the references to the murder and the murderer's defense.

The Art Commission rejected the work as inappropriate to the site after receiving a letter from Mayor Feinstein stating that Arneson's pedestal did not reflect the "spirit of nonviolence to which the City committed itself when it claimed for itself the name of St. Francis." Mayor Feinstein also argued that "an artist must be held accountable to his or her maquette" and that there must be "assurance that guidelines will not be spurned and standards disregarded." Arneson, upon advice of counsel, returned the compensation he had received for the commission. The bust was returned to him and subsequently sold to a private collector. (Gerald Nordland, *Controversial Public Art: From Rodin to di Suvero*, Milwaukee Art Museum, 1983.)

The Model Agreement seeks to provide a mechanism for resolving the type of controversy raised by the Arneson situation, by delimiting the creative discretion to be allowed the Artist after approval of the Proposal. In this connection, Arneson might have noted in his proposal the nature of his previous work, and that the spirit of that work often evoked social and political commentary and that such social and political commentary would be an integral part of the work not subject to subsequent review by the commissioning body.

Finally, to the extent possible, all parties should refrain from actions which inhibit the Artist in reaching creative solutions to the design problems the Artist has been commissioned to solve. The Artist, on his part, must be sensitive to the unique qualities of public art and the guidelines and parameters which are agreed.

1.5     Delivery and Installation.

        a.      The Artist shall notify the City in writing when fabrication of the

Work is completed and he or she is ready for its delivery and installation at the Site.

        b.      The Artist shall deliver and install the completed Work at the Site

in compliance with procedures approved by the City pursuant to Section 1.3 in

accordance with the approved schedule.

c.    The City shall be responsible for all expenses, labor and equipment to prepare the Site for the timely installation of the Work, including landscaping, footings, plumbing, public access, public security, and area and spot lighting of the Work.

**Annotation**

Where the size or scope of the Work, or the fee compensation schedule, make it appropriate, final approval of the fabricated work, as being in conformity with the proposal, should be made before delivery and installation in order to facilitate modifications in design and avoid unnecessary costs of transportation and installation. When the commissioning body is responsible for site preparation, the artist should coordinate closely with it to ascertain that the Site is prepared to receive the Work.

In those projects in which the artist is a member of the design team and the artwork is constructed on the site as an integral part of the environment, a more detailed description of the Artist's role in site supervision, construction and installation may be provided. Design approval in this instance most likely will occur at the same time as final acceptance.

1.6    <u>Post-Installation.</u>

a.    Within _____ days after the installation of the Work, the Artist shall furnish the City with the following photographs of the Work as installed:

(i)   Two sets of three 35-mm. color slides of the completed Work, on take from each of three different viewpoints;

(ii)  Two sets of three different 8" x 10" glossy black and white prints of the Work and negatives; and

(iii)  A set of three color transparencies of the completed Work.

b.    At the City's expense, the Artist shall be available at such time or times as may be agreed between the City and the Artist to attend any inauguration or presentation ceremonies relating to the transfer of the Work to the City. The City shall

use its best efforts to arrange for publicity for the completed Work in such art

publications and otherwise as may be determined between the City and the Artist as soon

as practicable following installation.

      c.    Upon installation of the Work, the Artist shall provide to the City

written instructions for appropriate maintenance and presentation of the Work.

### Annotation

All public art projects usually requires photographic documentation for archival purposes as provided in paragraph (a). The photographic documentation requested will, of course, depend on the requirements of the commissioning body. In rare instances it may be more appropriate to require the commissioning body to pay for and provide for photographic documentation.

Paragraph (b) of this section continues the dialogue previously encouraged between the community and the Artist. Even with a work conceived, approved and installed, the dialogue is not complete. The dedication often sets the tone for initial public reaction and, to the extent that the Work may evoke controversy, the Artist should be a participant in the debate.

The Artist should specify any special requirements for maintaining and preserving the Work. This section should be read in conjunction with the warranty section of Article 4 and the section on maintenance in Article 6.

1.7    Final Acceptance.

      a.    The Artist shall advise the City in writing when all services

required prior to those described in Section 1.6(b) have been completed in substantial

conformity with the Proposal.

      b.    The City shall notify the Artist of its final acceptance of the Work.

      c.    Final acceptance shall be effective as of the earlier to occur of (1)

the date of the City's notification of final acceptance of (2) the 30th day after the Artist

has sent the written notice to the City required under Section 1.7(a) unless the City, upon

receipt of such notice and prior to the expiration of the 30-day period, gives the Artist

written notice specifying and describing the services which have not been completed.

## Annotation

The purpose of this provision is to provide a method of determining with some degree of certainty when the work has been finally accepted by the city, since this is a signal event which is keyed to the creating or shifting of obligations between the parties' final acceptance by the City, since this is a signal event which is keyed to the creating or shifting of obligations between the parties' final acceptance is usually referred to under the Section 2.1 schedule of payments due the artist.  It is expressly referred to in the succeeding Sections 1.8 through 1.11 as a factor in determining title, ownership of documents, risk of loss, and indemnity.

While the mechanism for final acceptance starts with the assumption that the City will, in due course, notify the artist of its acceptance of the work, it also recognizes that the artist necessarily exercises an artistic judgment as to when the work is complete, and that the artist should therefore initiate the acceptance process.

Final acceptance is based upon completion of the artistic services referred to generally under Section 1.1.  Failure to complete or comply with obligations or requirements under the contract which are not independent and which clearly are ancillary to the performance of the artistic services should not provide grounds for denial of final acceptance.  Thus, failure to have obtained a performance bond, if required, should not prevent final acceptance once performance is completed.

However, final acceptance could reasonably be conditioned upon the artist's certification that all obligations incurred by the artist pursuant to Section 1.1 for "supplies, material, and equipment as necessary for the design, execution and installation of the Work" have been fully satisfied. Since final acceptance triggers a general indemnity provision (Section 1.9), the city could be expected to require proof from the artist that it is accepting the work free from all liens and encumbrances.

1.8    Risk of Loss.

The risk of loss or damage to the Work shall be borne by the Artist until final acceptance, and the Artist shall take such measures as are necessary to protect the Work from loss or damage until final acceptance; except that the risk of loss or damage shall be borne by the City prior to final acceptance during such periods of time as the partially or wholly completed Work is in the custody, control or supervision of the City or its agents for the purposes of transporting, storing, installing or performing any other ancillary services to the Work.

**Annotation**

The provision sets forth the standard practice of leaving the risk of loss or damage to the work-in-progress with the artist until final acceptance. The question of insurance for loss or damage is one which is left entirely to the artist's judgment under the circumstances.

It is recognized, however, that the artist increasingly functions as an element of a larger project, and that portions of his work may have to be performed outside the confines of the studio. Site preparation, transportation, storage and installation may be responsibilities undertaken by the artist, but they often are performed by the city or through its agencies and contractors. Under these circumstances, while the work is substantially removed from the artist's continuing dominion and control the risk of loss will shift accordingly.

The *force majeure* provision under Section 3.4 contemplates only an extension of time for performance in the event the work is damaged or destroyed. However, substantial damage or destruction of the work may permit either party to invoke the termination provision of Article 10.

1.9    Indemnity.

Upon final acceptance of the Work, the City shall, to the extent permitted by law, indemnity and hold harmless the Artist against any and all claims or liabilities

then existing or arising thereafter in connection with the Work, the Site, the Project or this Agreement except claims by the City against the Artist and claims which may occur as a result of the Artist's breach of the warranties provided in Article 4.

### Annotation

This provision may vary depending upon the statutory limitations affecting the ability of state or municipal agencies and bodies to enter into indemnity agreements.

This Section is keyed to the final acceptance process. The possibility that the city may find itself indemnifying the artist against the claims for the artist's suppliers and subcontractors is lessened considerably if final acceptance is conditioned upon certification by the artist that all such underlying claims, liens and encumbrances have been satisfied. Similarly, bonding and insurance provisions may be included in the agreement to protect against such claims.

1.10    Title.

Title to the Work shall pass to the City upon final acceptance.

1.11    Ownership of Documents, Models.

Upon final acceptance, all studies, drawings, designs, maquettes and models prepared and submitted under this Agreement shall be returned to the Artist and shall belong to the Artist. The City may select and the Artist shall convey to the City [one of] the original drawings submitted pursuant to Section 1.2 as part of the Proposal, the City representing that such drawing(s) will be used by it solely for exhibition and held by it in permanent safekeeping.

## Annotation

We have reviewed numerous public art commission agreements and find that the majority give ownership of all maquettes, drawings and other designs prepared in connection with the agreement to the artist. One notable exception is the present General Services Administration Art in Architectural Contract where such items are retained by the government for the National Museum of American Art, Smithsonian Institution.

It generally should not be presumed that the commissioning body has purchased the maquettes and models.

At best, the Artist usually only breaks even financially on public art commissions, and the ability to sell the maquettes, sketches, drawings, etc., produced I connection with the project often provides an essential source of income.

In many respects, the artist as a provider of design services can be analogized to the architect. The American Institute of Architects' standard form owner-architect contract provides that all drawings, models and maquettes remain the property of the architect, but gives the owner the right to copies of the drawings and plans.

The commissioning body and the public do have legitimate interests in documenting the history and evolution of the work. In those instances in which the commissioning body intends to exhibit the sketches and keep them for documentation and archival purposes, the second sentence in Section 1.11 may be added.

The exact language should be keyed to the specific requirements adopted for the proposal. In some circumstances, the commissioning body may wish to negotiate for ownership of all drawings, maquettes and models prepared and submitted in connection with the proposal. This may be appropriate when museum and other exhibition spaces are available.

In certain exceptional situations, the commissioning body may require acquisition of all drawings and maquettes prepared and submitted in connection with the Proposal as part of the fixed artist's fee. This position may not be justified if the only intention of the commissioning body is resale. In no event should the commissioning body, without further adjustment in price, obtain ownership of documents prepared by the artist subsequent to the preliminary proposal.

The question of ownership of the documents under this Section does not affect copyright in the sketches, models and maquettes, which remains with the artist, except as modified in Article 6. The commissioning body

may wish to retain the right to the photographic reproduction of the Proposal for public information and exhibition purposes.

Article 2.  Compensation and Payment Schedule

    2.1    Fixed Fee.

The City shall pay the Artist a fixed fee of $_____, which shall constitute full compensation for all services and materials to be performed and furnished by the Artist under this Agreement.  The fee shall be paid in the following installments, expressed as percentages of such fixed fee, each installment to represent full and final, nonrefundable payment for all services and materials provided to the payment thereof:

    a.    _____ percent (___%) upon the execution of this Agreement, recognizing that the Artist already has invested time and expense in preliminary design coordination with the City and other interested parties;

    b.    _____ percent (___%) within ten days after the City notifies the Artist of its approval of the Proposal;

    c.    _____ percent (___%) within ten days after the City notifies the Artist of its approval of the submission of detailed working drawings required under Section 1.3.

    d.    _____ percent (___%) within ten (10) days after the Artist notifies the City that the Work is fabricated and ready for installation at the Site.

    e.    _____ percent (___%) within ten (10) days after final acceptance.

**Annotation**

This traditional installment system for payment of compensation usually contemplates payments of a percent of a fixed fee upon readily defined dates such as the following: the execution of the agreement, submission of the Proposal, notice of approval of the Proposal, submission of detailed drawings, arrival of materials at the Artist's fabrication facilities or at the Site, notice by the Artist that installation is ready to begin, similar notice that installation is completed, and final acceptance.

If reasonable persons may differ as to the occurrence of a specified event, the installment should be payable upon notice given to one or the other that the event has occurred, or the definition of the occurrence should be modified to make it readily determinable in an objective manner. For example, installments should be paid on completion of defined phases, not when the work is "half complete."

In public art projects where the commissioning body and the Artist are sharing the expense of materials or labor, the installments are sometimes calculated and paid ratably as the expenses of materials and labor are incurred. This is done either on a percentage basis or dollar-for-dollar against vouchers for expenses incurred or soon to be incurred for materials and labor.

In some commissions, particularly in those in which the Artist is retained as a design consultant, the Artist will receive a fee for design and supervision, with out-of-pocket expenses paid against voucher and all other costs of construction, installation, insurance and the like paid for by the commissioning body.

2.2     Sales Taxes.

Any sales, use or excise taxes, or similar charges relating to services and materials, shall be paid by the City.

2.3     Artist's Expenses.

The Artist shall be responsible for the payment of all mailing or shipping charges on submissions to the City, the costs of transporting the Work to the Site, and the costs of all travel by the Artist and the Artists' agents and employees necessary for the proper performance of the services required under this Agreement.

**Annotation**

Sections 2.2 and 2.3 merely allocate those related expenses which are reimbursable to the artist and those which are costs to the paid from the fixed fee.


<u>Alternative Article 2</u>

<u>Article 2.</u>    <u>Compensation and Payment Schedule</u>

2.1    <u>Preliminary Design Proposal</u>.   Upon the execution of this

Agreement by the City, the City shall pay to the Artist an initial fee of $_____ for the

preparation of the Proposal as set forth in Section 1.2.  The initial fee may be retained by

the Artist, and no part of it shall be refunded, provided the Artist submits the Proposal to

the City as provided in Section 1.2(c).  If the Proposal is not so submitted, the City may,

by notice to the Artist, require the initial fee to be refunded to the City, whereupon this

Agreement shall terminate and there shall be no further obligations between the parties.

2.2    <u>Further Agreement</u>.  Acceptance of the Proposal shall be

contingent upon agreement between the City and the Artist upon a second fee, not

expected to exceed $_____, for execution, fabrication, transportation and

installation of the Work.

2.3    <u>Addendum</u>.

The payment for the Artist's services for the execution, fabrication,

transportation and installation of the Work shall be made at agreed-upon intervals and be

set forth by addendum to this Agreement, signed by the Artist and the City, upon

approval of the Proposal by the City.

[Sections 2.2 and 2.3 of usual Article 2 become Sections 2.4 and 2.5 if this Alternative Article 2 is used.]

**Annotation**

The alternative compensation language is offered for situations in which the scale and cost of the final project will not be known until after the proposal is approved.

In this circumstance, it is usual to pay the artist for preparing the proposal and to postpone until after acceptance of the Proposal the fixing of the further fee due to the Artist (or a fabrication and installation corporation designated by him) for completion of the post-approval aspects of the project.

The disadvantage of this approach is the uncertainty of a commitment of either the Artist or the commissioning body to proceed with the project even after a proposal is approved, since later negotiations over compensation and scheduling may sometimes defeat an otherwise worthwhile project.

Article 3.    Time of Performance

3.1    Duration.  The services to be required of the Artist as set forth in Article 1 shall be completed in accordance with the schedule for completion of the Work as proposed by the Artist and approved by the City pursuant to Section 1.3, provided that such time limits may be extended or otherwise modified by written agreement between the Artist and the City.

3.2    Construction Delays.  In the event that the Artist completes fabrication or procurement of the Work in accordance with the approved schedule and is delayed from installing it on or before the time specified in the schedule as a result of the construction of the Site not being sufficiently complete reasonably to permit installation of the Work therein, and the Artist notifies the City that the Work is ready for installation,

the City shall promptly reimburse the Artist for reasonable transportation and storage costs incurred for the period between the time provided in the schedule for commencement of installation and the date upon which the Site is sufficiently complete to reasonably permit installation of the Work.

       3.3    <u>Early Completion of Artist Services</u>.  The Artist shall bear the transportation and storage costs resulting from the completion of his services hereunder prior to the time provided in the schedule for installation.

       3.4    <u>Time Extensions</u>.  The City shall always grant a reasonable extension of time to the Artist in the event there is a delay on the part of the City in performing its obligations under this Agreement or in completing the underlying capital project, or if conditions beyond the Artist's control or Acts of God render performance of the Artist's services impossible or unexpectedly  burdensome.  Failure to fulfill contract obligations due to conditions beyond either party's reasonable control will not be considered a breach of contract; provided that such obligations shall be suspended only for the duration of such conditions.

**Annotation**

The provisions of the Model Agreement providing for careful coordination of schedules between the commissioning body and the artist, and responsibility for the coordination with other participants in related work, can be overemphasized.  More unsuccessful public art projects have come to grief through poor coordination than for any other reason.

The Model Agreement attempts to provide rigor in the establishment of a schedule, and equitable flexibility in the procedures for maintaining communication necessary to modify the schedule as required.  The objective is the maintenance of cooperation to ensure that the work will be realized.

Article 4.     Warranties

    4.1     Warranties of Title.

    The Artist represents and warrants that: (a) the Work is solely the result of the artistic effort of the Artist; (b) except as otherwise disclosed in writing to the City, the Work is unique and original and does not infringe upon any copyright; (c) that the Work or a duplicate thereof, has not been accepted for sale elsewhere; and (d) the Work is free and clear of any liens from any source whatever.

    4.2     Warranties of Quality and Condition.  The Artist represents and warrants, except as otherwise disclosed to the City in writing in connection with submission of the Proposal pursuant to Section 1.2(c), that: (a) the execution and fabrication of the Work will be performed in a workmanlike manner; (b) the Work, as fabricated and installed, will be free of defects in material and workmanship, including any defects consisting of "inherent vice" or qualities which cause or accelerate deterioration of the Work; and (c) reasonable maintenance of the Work will not require procedures substantially in excess of those described in the maintenance recommendation to be submitted by the Artist to the City hereunder.

    The warranties described in this Section 4.2 shall survive for a period of one year after the final acceptance of the Work.  The City shall give notice to the Artist of any observed breach with reasonable promptness.  The Artist shall, at the request of the City, and at no cost to the City, cure reasonably and promptly the breach of any such warranty which is curable by the Artist and which cure is consistent with professional conservation standards (including, for example, cure by means of repair or refabrication of the Work).

**Annotation**

Section 4.1 recognizes that the Artist is responsible for assuring that the work is original and free of liens, does not infringe any copyright and has not previously been sold.

Section 4.2 reflects the artist's responsibility for fabricating the Work in quality materials, in accordance with professional, "workmanlike' standards and with a sensitivity to the nature and long-term behavior of materials and methods used, the conservation goals of the commissioning body and the conditions of the installation site (including weather, temperature, type and density of audience, and other environmental and architectural features of the site).

By permitting written disclosure of factors at odds with these concerns, and excluding such disclosed factors from the Artist's warranties, the agreement also recognizes that the artist's aesthetic choices and goals may sometimes be antithetical to – and of paramount importance to – concerns of maintenance and conservation. For example, the Artist may choose to work with materials that are intended to change in appearance over time or exposure to the elements; or the artist may wish to try experimental techniques and materials that do not age in a traditional way or the conservation impact of which is not fully known. Such inventiveness should not be discouraged so long as they are disclosed at a time when the City can make an informed evaluation of the impact of such disclosure on the standard warranties, *i.e.*, upon submission of the proposal pursuant to Section 1.2(c).

The artist's warranties relating to defects and "inherent vice" (a term used by conservators to describe a quality of a work of art which causes or accelerates physical deterioration of the work) are particularly important to a potential owner of an artwork in view of the fact that most standards fine arts insurance policies will not cover damage or loss of value sustained as a result of a defect or inherent vice in a work. Defects in design and materials can result in a decrease or total loss in value of the artwork, expenses for conservation work to rectify defects, or even liability for personal injury.

Costs of conservation and maintenance undertaken as a result of normal "wear and tear" on an artwork also are not reimbursable under an insurance policy but rather are continuing expenses of upkeep of a work. A purchaser of a commissioned artwork should be aware of any extraordinary conservation procedures or any high maintenance factors which may be costly or difficult to undertake.

The artist's warranties relating to the condition and quality of the work are limited to a period of one year, since most instances in which serious defects have become evident in public art have occurred within that time frame. The length of the warranty should, however, be set in light of the nature of the work, the type of materials and methods used with respect to the work, the conservation record relating to similar works, the period of time during which defects are likely to manifest themselves, the cost of the work, and the potential liability involved.

The artist is required, at the request of the commissioning body, to cure defects resulting from substandard workmanship, if his or her "cure" is consistent with professional conservation standards.

If a breach of a warranty is not curable by the artist, the artist may then be responsible for reimbursing the city for damages, expenses and loss incurred by the city as a result of a breach in or inaccuracy of a warranty or representation.

In view of the probable importance of conservation considerations to the city, the limitation on certain of the artist's warranties and the likely failure of insurance coverage to respond to these issues, it may be desirable for the city to obtain an independent expert evaluation of the materials and techniques used in the work prior to acceptance.

Article 5.        Insurance

5.1      [                                                    ]

**Annotation**

No model clauses are provided with respect to liability insurance, since appropriate provisions would vary greatly in different circumstances, depending on state or local requirements, the size of the project, whether extensive or prolonged fabrication and installation will be performed at the site, and other factors.

The person who is responsible for obtaining and paying for insurance coverage – whether the artist, the commissioning body, or another person such as a general contractor, if the project also involves building construction – will also vary, depending on the nature of the activities of the persons involved in the project and the availability and cost of coverage to each such person.

For example, if the artist is primarily responsible for designing a work that will be installed by others at the site, it is unlikely that the artist would be responsible for obtaining liability insurance coverage.

Normally, insurance would cover claims and losses for both personal injury and property damage arising from performance of the agreement, and would cover subcontractors and employees of the insured. Workmen's compensation insurance and automobile liability insurance, as well as public liability insurance, may be required.

If the artist is responsible for obtaining coverage, the commissioning body (and landowner, if different) should be named in the policy as an additional insured with respect to the coverage, and vice-versa. The person contracting the insurance usually is required to provide a certificate of insurance or other evidence of adequate coverage to the other insured which also would likely require at least ten days' prior notice of change or cancellation of the policy.

5.2    The Artist shall not be required by the City to post any

performance bonds or similar undertakings, and any requirement of any other authority

for performance bonds shall be the responsibility of the City.

### Annotation

Contractors on usual public works construction projects are routinely required to obtain bonds guaranteeing performance of the contract and proper payment to all subcontractors, materialmen and suppliers. While public art commissions customarily do not require artists to obtain performance bonds, where artists are given design responsibility for an entire site and as projects shift from the isolated art object to artwork integrated with its environment, administrators may feel compelled to request performance bonds.

A recent opinion by a county attorney construed a state statute which required a performance bond for a "work" or "improvement" on public property as including an artwork commissioned for the county jail. The artwork involved extensive on-site construction. The Sacramento Metropolitan Arts Commission had never required a performance bond for an art project with the city but was asked by the county to handle a public art project for it: an aquarium serving as a wall, and a seating area, to be designed by Doug Hadlis as part of a jail construction project. The bond was required because the artist was not known to the county and because

the administrator thought the work resembled "construction" rather than "a work of art."  The premium cost of the bond was ultimately added to the project budget, relieving the artist of the additional expense.

The Mille Act, 40 U.S.C.A. §270a, requires a performance bond on all federal construction contracts over $25,000.  However, the project director of the Art Program at the National Oceanic and Atmospheric Agency, Seattle, Washington, chose to negotiate professional services contracts rather than construction contracts with the artists even though the projects resembled construction more than studio pieces; thus, the Miller Act was inapplicable.  An identical contract was used for architects, construction managers, and researchers on the project.

Architects and engineers typically are exempt from bonding requirements.  The Oregon Court of Appeals explained, "Since performance of a contract involving aesthetic judgment cannot be measured objectively, it would not be reasonable to require an architect to post a performance bond."  Monglovi v. Doerner, 24 Or. App. 639, 546 P.2d 1110, 1113 (1976).

The analogy to the architect is appropriate for the public artist.  Since the artist is a provider of professional services which are unique, the performance bond seems unsuitable as a mechanism for assuring performance.  The artist's performance is best assured by a contract (such as the Model Agreement) with payments in installments based on phases of the project as they are completed and, if appropriate, an invoice for final payment which is accompanied by a statement from each subcontractor that the financial obligation has either been met in full or has been settled to the subcontractor's satisfaction.  If a performance bond is required, it should only cover that percentage of the artist's fee which represents on-site fabrication.

Article 6.        Reproduction Rights.

6.1      The Artist retains all rights under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq*., and all other rights in and to the Work except ownership and possession, except as such rights are limited by this Section 6.1.  In view of the intention that the Work in its final dimension shall be unique, the Artist shall not make any additional exact duplicate, [three]-dimensional reproductions of the final Work or permit others to do so except by written permission of the City.  The Artist grants to the City and

its assigns an irrevocable license to make two-dimensional reproductions of the Work for non-commercial purposes, including but not limited to reproductions used in advertising, brochures, media publicity, and catalogues or other similar publications, provided that these rights are exercised in a tasteful and professional manner.

6.2     All reproductions by the City shall contain a credit to the Artist and a copyright notice substantially in the following form:  (c) [Artist's name], date of publication.

6.3     The Artist shall use his or her best efforts to give a credit reading substantially, "an original work owned and commissioned by [City] _____," in any public showing under the Artist's control of reproductions of the Work.

## Annotation

Copyright is a property right which allows the artist (or one to whom he or she transfers the right) to prevent unauthorized copying, publishing or other use of his or her copyrighted work.  In effect, the copyright law gives the initial owner of the copyright the exclusive right to reproduce the work and to prepare derivative works.

A new Federal Copyright Law, the Copyright Revision Act of 1976,  17 U.S.C. §§ 101 *et seq*., became effective in 1978.

Under the new law, the owner of the rights protected by copyright is the creator of the work unless the work is a "work made for hire."  A work made for hire is defined as (1) "a work prepared by an employee within the scope of his or her employment," or (2) "a work specially ordered or commissioned" for certain uses specified in the statute.  A work of art commissioned for a public space would not normally be such a use.  It is generally accepted, therefore, that the artist initially owns the copy right in the work.  Unless there is a written agreement that transfers the copyright to the purchaser of a work of art, the creator automatically retains the copyright.  Not only is copyright completely separate from ownership of a physical work of art, but each of the exclusive rights of copyright can be subdivided.

The Model Agreement does not provide for a blanket assignment of copyright ownership to the commissioning body. A blanket transfer to the commissioning body of copyright control in the work gives the commissioning body more than it reasonably needs and, more importantly, probably more than it has paid for given the fact that the artist's fee is not usually sufficient to reflect compensation for reproduction rights; as noted previously, public commissions rarely are financially rewarding for the artist.

Article 6 of the Model Agreement strikes a balance to permit the Model Agreement strikes a balance to permit the commissioning body to utilize reproductions in connection with publicity about the work and connection with publicity about the work and protects its legitimate interest in not having the artist reproduce identical works for others. At the same time, the artist controls the important right to derivative utilization of the work in ways which do not deprive the commissioning body of the unique quality of its purchase and its potential symbolic effect. The artist is thus free to use the work or the themes embodied therein, in future works – an important right for artists developing a continuing body of work.

The image of a work of public art often may become a symbol for a city. For example, the Alexander Calder piece, "La Grande Vitesse," has given a sense of place to the square in Grand Raids, Michigan, in which it is located, and the image of the sculpture is reproduced on city vehicles and the mayor's stationary. Article 6 does not prohibit such use, unless additional language is negotiated by which the artist transfers a non-exclusive license to the commissioning body, presumably for a royalty or some other additional compensation.

If, however, the commissioning body wishes to reproduce the work on tee-shirts, post cards and posters, or  make other commercial use of the image, the language of Article would prohibit such use, unless additional language is negotiated by which the artist transfers a non-exclusive license to the commissioning body, presumably for a royalty or some other additional compensation.

The Oregon Arts Commission, in a recently adopted contract, provided the following alternative language:

> The WORK created under this agreement shall be the property of the CITY. Any rights of copyright shall be in the CITY after completion and transfer of the WORK to the CITY. ARTIST shall deliver a bill of sale or other appropriate evidence of transfer to the CITY of all rights, including copyright, upon payment of ARTIST'S fee.

ARTIST shall not make any type of reproductions of the finished work except by written permission of CITY. However, ARTIST shall have the right to include photographs or other representation of the WORK in the ARTIST'S portfolio, catalogues or other similar publications, provided there is prominent reference to the fact that the WORK is installed in the building under the CITY'S 1 percent for Art Program, administered by the Metropolitan Arts Commission. The ARTIST shall also have the right to reproduce the maquette for ARTIST'S personal collection.

Similarly, CITY shall not make any type of reproductions of the finished work except by written permission of ARTIST. However, CITY shall have the right to include photographs or other representation of the WORK in the CITY'S portfolio, catalogues or other similar publications, provided there is prominent reference of the fact that the WORK was created by the ARTIST.

The rationale raised by the Commission for this complex transfer and retransfer – which gives the City no substantially greater rights than those available to it under the Model Agreement, but deprives the Artist of the valuable right to make derivative works – was that the Commission would have the right to proceed against infringing third parties only if it were the copyright holder. While this is correct as a matter of copyright law, the Artist would normally have an even more compelling interest in preventing unauthorized reproductions.

Section 6.2 serves to protect the copyright of the Artist by requiring that the appropriate notice appear on all copies of the work. Further, even if the city were to breach its agreement and omit the notice, under the Copyright Revision Law of 1976 the omission of notice does not cause the work to fall into the public domain if the notice was left off copies against written instructions (here set forth in the Model agreement) that the notice appear on the work.

Registration is not necessary to gain copyright protection but registration does have important advantages. Registration must occur before infringement, in order to obtain an award of statutory damages and attorney's fees. If the only rights provided to the commissioning body may be unwilling to register the copyright in the Artist's name. Registration by the commissioning body may encourage the artist to protect his own rights from infringement if statutory damages and attorney's fees are available. (Section 6.2 should probably be omitted if the artist retains all rights to copyright. In such case, the artist should register the work.)

<u>Article 7.</u>        <u>Artist's Rights</u>.

      7.1    <u>Identification</u>.  The City shall, at its expense, prepare and install at the Site, pursuant to the written instructions and subsequent approval of the Artist, a plaque identifying the Artist, the title of the Work and the year of completion, and shall reasonably maintain such notice in good repair against the ravages of time, vandalism and the elements.

**Annotation**

Article 7 of the Model Agreement provides for certain limited artist's rights sourced in the civil law doctrines of *droit moral*, or moral rights.

*Droit moral* is distinct from copyright.  Copyright protects the artist's right to exploit a work – a property right.  The right of *droit moral* is a personal right protecting an artist's reputation, personality and expression.

Under the doctrine of *droit moral*, the creator of a work of art retains a legally protected interest in the treatment of his or her work notwithstanding the transfer of ownership.  The moral rights doctrine primarily protects two rights: the right of paternity and the right of integrity.  The right of paternity is the author's right to be recognized by the public as the creator of a particular work of art (Section 7.1), and under certain circumstances, to be able to disclaim authorship.  The right of integrity is the right of the artist, even after he or she relinquishes title to a work, to prevent the alteration, mutilation or distortion of the work (Section 7.4).

The traditional American value of the free alienability of property conflicts with the civil law concept.  In the past, the concept of *droit moral*, if recognized at all, was recognized under theories of contract, libel, privacy and unfair competition law.  <u>Gilliam v. ABC</u>, 538 F.2d 14 (2d Cir. 1976); <u>Grang v. Harris</u>, 198 F.2d 585 (2d Cir. 1952).

Recently, however, several states have enacted statutes that grant artists significant moral right protection (Section 7.8 and annotation).  In addition, the rights contained herein already have acquired a history in public art commission agreements.

Section 7.1 incorporates certain aspects of the right of paternity; the artist has the right to be recognized by the public as the creator of the work.

7.2    <u>Maintenance</u>.  The City recognizes that maintenance of the Work on a regular basis is essential to the integrity of the Work.  The City shall reasonably assure that the Work is properly maintained and protected, taking into account the recommendations of the Artist provided in accordance with Section 1.5(f), and shall reasonably protect and maintain the Work against the ravages of time, vandalism and the elements.

**Annotation**

When an artwork is first installed, no one can be sure how it will hold up. Someone must assume the responsibility for maintenance and security.  It is usually the responsibility of the commissioning body to maintain the artworks.

The standard of care imposed on the commissioning body is one of reasonable care.

7.3    <u>Repairs and Restoration</u>.

a.    The City shall  have the right to determine, after consultation with a professional conservator, when and if repairs and restorations to the Work will be made.  During the Artist's lifetime, the Artist shall have the right to approve all repairs and restorations, provided, however, the Artist shall not unreasonably withhold approval for any repair or restoration of the Work.  If the Artist unreasonably fails to approve any repair or restoration, the City shall have the right to make such repair or restoration.  To the extent practical, the Artist, during the Artist's lifetime, shall be given the opportunity to make or personally

supervise significant repairs and restorations and shall be paid a

reasonable fee for any such services, provided that the City and the Artist

shall agree in advance and in writing upon the Artist's fee for such

services.

        b.      All repairs and restorations shall be made in accordance

with recognized principles of conservation.

## Annotation

Many artists are adamant about having the right of first refusal if repairs
are necessary.  The Model Agreement supports this view but requires that
all repairs be carried out in accordance with professional conservation
standards.  The important point is that a professional conservator should
be consulted for any repair or restoration.  Section 7.3 and Section 7.4 not
only protect the legitimate interest of the artist in his or her artistic and
intellectual creation, but also reflect the public interest in preserving
cultural and artistic creations.

7.4     <u>Alteration of the Work or of the Site</u>.

        a.      The City agrees that it will not intentionally damage, alter,

modify or change the Work without the prior written approval of the

Artist.

        b.      The City shall notify the Artist of any proposed alteration

of the Site that would affect the intended character and appearance of the

Work and shall consult with the Artist in the planning and execution of

any such alteration and shall make a reasonable effort to maintain the

integrity of the Work.

        c.      Nothing in this Section 7.4 shall preclude any right of the

City (1) to remove the Work from public display, or (2) to destroy the

Work (limiting conditions).  If the City shall at any time decide to destroy

the Work, it shall by notice to the Artist offer the Artist a reasonable

opportunity to recover the Work at no cost to the Artist except for an

obligation of the Artist to indemnify and reimburse the City for the

amount by which the cost to the City of such recovery exceeds the costs to

the City of the proposed destruction.

### Annotation

(a)     Section 7.4(a) is the classic expression of the right of integrity.
The city's obligation under this section may not extend to
alteration of the Site unless the Artist has specifically provided that
the site is an integral part of the work.  As to remedies for a breach
of this section, equitable relief may be appropriate when damages
are inadequate or difficult to ascertain and when the wrong can be
cured.  This may compel the city to cure the wrong by restoration
since in many cases, alteration may occur before preventive
remedies such as injunctive relief are available.  Damages for
breach of this contractual obligation may be more difficult to
establish, but presumably would include the resulting injury to the
artist's reputation.

(b)     Even in situations in which the site is not an integral part of the
work so as to make alterations of the site fall within the parameters
of that paragraph (a) of this Section, to the extent that alterations of
the site affect the work, the city, under the terms of Section 7.4(b),
must consult with the artist.

(c)     Most foreign jurisdictions do not, under the doctrine of *droit
moral*, prohibit the destruction of artwork on the ground that once
a work of art no longer exists, an artist's reputation cannot be
injured.  It is a matter of heated debate whether a public art
commission agreement should restrict the right to destroy the work
of public art.  Notwithstanding any strong public interest in the
preservation of works of public art, it appears that in the end, any
limitations placed on this right of the commissioning body must be
left to the negotiating process.  For example, limitations of the
right to destroy a work of public art might permit the
commissioning body to destroy the work only if the site was
needed for other purposes and the work could not be removed

without significant alteration.  Similarly, a limitation negotiated by the artist on the right to remove the work from public display might require that the work shall remain on public display for a period of at least a specified time after completion unless liquidated damages of an agreed amount of money are paid to the artist for every month in that specified period in which such public display is shortened.

(d)    It is generally thought advisable that commissioning bodies engaged in programs of public art develop a procedure which details the conditions under which a work of art can be removed from public display or destroyed.

7.5    <u>Permanent Record</u>.  The City agrees to maintain on permanent file a record of this Agreement and of the location and disposition of the work.

**Annotation**

It is important for archival and notice purposes to maintain a record of works of art commissioned by public bodies.  This requirement may sometimes be omitted in private commissions.

7.6    <u>Artist's Address</u>.        The Artist shall notify the City of changes in address.  The failure to do so, if such failure prevents the City from locating the Artist, shall be deemed a waiver by the Artist of the right subsequently to enforce those provisions of this Article 7 that require the express approval of the Artist.  Notwithstanding this provision, the City shall make every reasonable effort to locate the Artist when matters arise relating to the Artist's rights.

**Annotation**

The artist will not be able to enforce his or her rights under this Section if he or she does not keep the city informed as to his or her whereabouts.

X        7.7     <u>Surviving Covenants</u>.  The covenants and obligations set forth in

this Article 7 shall be binding upon the parties, their heirs, legatees, executors,

administrators, assigns, transferees and all their successors in interest, and the City's

covenants do attach and run with the Work and shall be binding to and until twenty (20)

years after the death of the Artist.  However, the obligations imposed upon the City by

Sections 7.3(a) and 7.6 shall terminate on the death of the Artist.  The City agrees that

any subsequent purchaser of the Work will be given notice of the covenants herein in

writing so as to be bound thereby.

**Annotation**

The Model Agreement provides that the covenants other than the right to
make repairs (which is clearly a personal right) survive until twenty years
following the artist's death.  (In Europe, the *droit moral* is perpetual in
surviving the death of the artist.)

7.8     <u>Additional Rights and Remedies</u>.  Nothing contained in this Article

7 shall be construed as a limitation on such other rights and remedies available to the

Artist under the law which may now or in the future be applicable.

**Annotation**

California, Massachusetts and New York have enacted statutes to protect
the rights of authorship and integrity.  The California and Massachusetts
statues differ substantially from the New York law in their approach.  The
California Art Preservation Act, Cal. Civ. Code §987 (West 1982) (the
"California Act") and Chapter 231 of the Massachusetts General Laws,
Section 855, are aimed directly at preventing destruction and alteration of
works of art of recognized quality, while the New York Artist's
Authorship Rights Law, N.Y. Gen. Bus. Law §228 (1983) (the "New York
Act") is aimed at preventing damage to an artist's reputation.

The New York Act borrows from the law of libel and misrepresentation
and reflects an interest in the personal rights of the artist rather than the
public's interest in the physical preservation of artwork.  Thus, the New

York Act does not prevent the destruction of an artwork but prevents the knowing public display or publication of a work of fine art of an artist "or a reproduction thereof in an altered, defaced, mutilated or modified form if the work is displayed, published or reproduced as being the work of the artist or under circumstances under which it would reasonably be regarded as being the work of the artist, and damage to the artist's reputation results."

The New York Act primarily is concerned with the right of paternity, but a limited right of integrity may be implied since the New York Act empowers the artist to prevent the display of his or her work in an altered form with the artist's name or in circumstances in which it would reasonably be assumed to be the artist's work.

It is too early to determine how the New York Act will be interpreted and enforced, since its effective date was January 1, 1984.  In some respects, its application may be broader than the California law, which only protects against the physical alteration of the work and does not apply to the context in which the work is displayed.

For example, in one of the early cases filed under the New York Act, an artist, Larry Rivers, alleged a violated of the New York law when an illustration prepared by him was used to illustrate what he termed an "offensive doggerel."  Larry Rivers v. Conde Nast Publications Inc., 84 Civ. 5571 (MP) (S.D.N.Y. 1984).

Injunctive relief is available under both laws – in New York, to prevent or terminate prohibited displays and publications, and in California, to prevent intentional alteration or destruction of the work.  Restoration of an altered work also may be compelled under California law.  Both statutes provide for actual damages but provide little guidance in computing such damages.

Section 7.8 makes clear that the contractual rights provided herein are in addition to and do constitute a waiver of any rights or remedies created by statutes like that of New York's and California's.

## OPTIONAL

x          7.9     [Resale Royalty.  The City agrees that if in the future the City sells

the Work, during the lifetime of the Artist, the City shall pay the Artist a sum equal to

fifteen percent (15%) of the appreciated value of the Work.  For the purpose of this

Agreement, appreciated value shall mean the sales price of the Work less the original fixed fee stipulated in this Agreement, as amended.  Nothing in this Agreement shall be construed to impose any obligation on the City as to the method of sale or disposal.  The choice of such method of sale or disposal shall be the sole right of the City.]

**Annotation**

We offer for consideration a clause for which the artist may wish to negotiate, recognizing that the clause has not received widespread utilization.

The basic of the *droit de suite*, or art proceeds right, is to provide greater economic security for artists.  Only California has enacted the proceeds right into law.  Cal. Civ. Code §986 (West 1985).  It is beyond the scope of this Annotation to discuss the arguments for and against the right.  However, one of the arguments occasionally made by some opponents of proceeds rights statutes is that they are unnecessary: the artist can contract for such a right which becomes one element in a bargaining process.  In favor of the provision is the fact that the artist often has sacrificed monetary gain for the public exhibition of his or her work, an advantage which is lost if the work is sold to a private collector for private exhibition.  Because of the controversial nature of the proceeds right, we have made this an optional provision to be decided as a policy matter or included as part of the negotiating process with the commissioning body.

Article 8.    Artist as Independent Contractor.

The Artist shall perform all work under this Agreement as an independent contractor and not as an agent or an employee of the City.  The Artist shall not be supervised by any employee of the City, nor shall the Artist exercise supervision over any employee or official of the City.

**Annotation**

This provision of the Model Agreement reaffirms that the artist is not an employee of the city.  The artist's status as an independent contractor is not only significant for copyright law purposes, but also has tax

consequences; for example, the city will not withhold income taxes. In addition, the artist will not be entitled to vacation, sick leave, retirement or other benefits afforded the commissioning body's employees.

Article 9.    Assignment, Transfer, Subcontracting

9.1    Neither the City nor the Artist shall assign or transfer an interest in this Agreement without the prior written consent of the other, provided, however, that claims for money due or to become due from the City under this Agreement may be assigned to a financial institution without approval.

9.2    The Artist may subcontract portions of the Work at the Artist's expense provided that said subcontracting shall not affect the design, appearance or visual quality of the Work and that such Work is carried out under the personal supervision of the Artist.

**Annotation**

A material element of this Agreement is the personal skill, judgment and creativity of the artist. The artist is not permitted to assign or transfer the creative and artistic portions of the Work to another without the prior written approval of the commissioning body. Similarly, the artist should have the right to approve any transfer of the commissioning body's rights and responsibilities under the Agreement.

Article 10.    Termination.    If either party to this Agreement shall willfully or negligently fail to fulfill in a timely and proper manner, or otherwise violate any of the covenants, agreements or stipulations material to this Agreement, the other party shall thereupon have the right to terminate this Agreement by giving written notice to the defaulting party of its intent to terminate specifying the grounds for termination. The defaulting party shall have thirty (30) days after receipt of the notice to cure the default.

If it is not cured, then this Agreement shall terminate.  In the event of default by the

Artist, all finished and unfinished drawings, sketches, photographs and other work

products prepared and submitted or prepared for submission by the Artist under this

Agreement shall at the City's option become its property, provided that no right to

fabricate or execute the Work shall pass to the City, and the City shall compensate the

Artist pursuant to Article 2 for all services performed by the Artist prior to termination.

Notwithstanding the above, the Artist shall not be relieved of liability to the City for

damages sustained by the City by virtue of any breach of the Agreement by the Artist,

and the City may reasonably withhold payments to the Artist until such time as the exact

amount of damages due the City from the Artist is determined.

**Annotation**

The normal remedy for breach of contract is damages, and in certain
circumstances, specific performance.  Article 10 provides that the
Agreement may be terminated for cause provided the breaching party is
afforded thirty days to cure the breach and fails to do so.  It also provides
the commissioning body with the option of acquiring the maquettes and
models, presumably as an offset to its damage claim, since under the
Agreement, the commissioning body would not be entitled to such
drawings, maquettes and models if the Artist were not in breach.

In some situations, particularly where the underlying capital improvement
project so provides, the commissioning body may require that the
Agreement give the commissioning body the right to terminate for
convenience as well as for cause.  Construction contracts often include
provisions permitting termination for convenience where the owner finds
after entering into a contract that funding is unavailable or needs have
changed.  Ordinarily, where a contract is terminated for convenience, the
contractor is entitled under the contract to receive full payment for all
work performed.  Without such a provision, most circumstances which
would cause an owner to want to terminate a contract would not be
sufficient to constitute impossibility, frustration of purpose or other
grounds which would relieve the owner of contractual obligations.

Large-scale collaborative projects may require a termination for convenience clause. If the right to terminate for convenience is provided t the commissioning body, the artist also should have the right.

A clause that combined both convenience and cause is as follows:

(a)  The services to be performed under this Agreement may be terminated by either party subject to written notice submitted thirty (30) days before termination, provided that attempts to reconcile the reason for termination have been undertaken but failed. The notice shall specify whether the termination is for convenience or cause

(b)  If the termination is for the convenience of the City, the Artist shall have the right to an equitable adjustment in the fee (without allowance for anticipated profit on unperformed services), in which event the City shall have the right at its discretion to possession and transfer of title to the sketches, designs and models already produced by the Artist under this Agreement prior to the date of termination, provided that no right to fabricate or execute the Work shall pass to the City.

(c)  If termination is for the convenience of the Artist, the Artist shall remit to the City a sum equal to all payments (if any) made to the Artist pursuant to this Agreement prior to termination.

(d)  If termination is for cause...

Article 11.    Contract Administrator.  The Contract Administrator for this Agreement shall be the [executive Director of Arts Commission]. Wherever this Agreement requires any notice to be given to or by the City, or any determination or action to be made by the City, the [Executive Director] shall represent and act for the City.

Article 12.    Non-Discrimination.   In carrying out the performance of the services designated, the Artist shall not discriminate as to race, creed, religion, sex, age, national origin or the presence of any physical, mental or sensory handicap, and the Artist shall

comply with the equality of employment opportunity provisions of Ordinance _____

as presently existing or hereafter amended.

**Annotation**

Some non-discrimination (and often anti-bribe, as well) clauses usually are required by local laws for public authority contracts.

<u>Article 13</u>.    <u>Compliance</u>.    The Artist shall be required to comply with federal, state

and City statutes, ordinances and regulations applicable to the performance of the Artist's

services under this Agreement.

<u>Article 14</u>.    <u>Entire Agreement</u>.  This writing embodies the entire agreement and

understanding between the parties hereto, and there are no other agreements and

understandings, oral or written, with reference to the subject matter hereof that are not

merged herein and superceded hereby.

<u>Article 15</u>.  <u>Modification</u>.  No alteration, change or modification of the terms of the

Agreement shall be valid unless made in writing and signed by both parties hereto and

approved by appropriate action of the City.

<u>Article 16</u>.    <u>Waiver</u>.  No waiver of performance by either party shall be construed, or

operate as a waiver of any subsequent default of any terms, covenants and conditions of

this Agreement.  The payment or acceptance of fees for any period after a default shall

not be deemed a waiver of any right or acceptance of defective performance.

<u>Article 17</u>.    <u>Governing Law</u>.  This Agreement, regardless of where executed, shall be

governed by and construed in accordance with the laws of the State of _____.

<u>Article 18</u>.    <u>Heirs and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the City and the Artist and their respective heirs, personal representations, successors and permitted assigns.

<u>Article 19</u>.    <u>Arbitration</u>.  All disputes or controversies that may arise between the parties with respect to the performance, obligations or rights of the parties under this Agreement, including disputes as to the physical acceptability of the work or any alleged breach thereof, which cannot be otherwise settled shall be settled by arbitration to be held in _____, in accordance with the then-current Rules of Commercial Arbitration of the American Arbitration Association; however, consideration of artistic merit being a matter for the exclusive determination of the Artist, no dispute or controversy may arise thereto.

The dispute shall be referred to a panel of three arbitrators, one to be selected by the Artist, one to be selected by the City, and the third to be selected by the first two.  If an agreement on the third arbitrator cannot be reached within thirty (30) days after the appointment of the second arbitrator, such arbitrator shall be appointed by _____.

The decision and award of the arbitrators, or that of any two of them, shall be final and binding on the parties, and judgment may be entered upon it in any court having jurisdiction thereof.

**Annotation**

In addition to the usual arguments favoring arbitration over court litigation of disputes (i.e., that it is quicker, less expensive and permits more flexible and informal rules of evidence and construction), there also is the

consideration that disputes over public artworks may be too controversial to risk submitting to a jury or any sort of public trial.  The arbitration clause also provides the artist with the assurance of being able to select a strong advocate for his or her position on the arbitration panel.

As a general proposition, states and municipal corporations and agencies are competent to enter into agreements to arbitrate as a consequence of their power to enter into contracts.  Exceptions to this rule arise either by reason of a specific restriction in a charter, statute or enabling document, or under circumstances where the dispute submitted to arbitration involves review of what amounts to executive acts which, as a matter of public policy, may only be reviewed through the appropriate mandamus proceedings.  In contrast to the general proposition, agencies of the federal government have no implied authority to enter into arbitration agreements and may do so only under express statutory authority.

This arbitration clause removes from the scope of arbitration disputes as to "artistic merit."  Since, as a rule, the arbitrators decide the question of whether or not the dispute is covered by the arbitration clause, it may be expected that in most disputes, the threshold issue to be addressed by the arbitrators will be whether or not the dispute really is one over "artistic merit."

The artist must also take care to assert his or her claim in a timely fashion, since most statutory limitations for asserting claims against states and municipalities apply to arbitration as well as court litigation.  In this regard, determination of when the claim arises may implicate the various notice and time provisions in the contract.

A further consideration must be given to whether the Artist is a primary contractor of the state or municipal agency or of a subcontractor.  The problem may arise that even though a statutory prohibition against state or municipal arbitration may not extend to the arbitration provision in a subcontract, an arbitration award under the subcontract may not be recognized in settling claims between the prime contractor and the state or municipal agency.

Article 20.    Notices.  All notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given upon the delivery or receipt thereof, as the case may

be, if delivered personally or sent by registered or certified mail, return receipt request,

postage prepaid, as follows:

      a. If the City, to:      _____

                                 _____

                                 _____

      b.  If to the Artist, at the address first above-written with a copy to:

                    [Address of Artist's attorney]

      IN WITNESS WHEREOF, the parties hereto have executed this Agreement on

the day and year first written above.

      CITY, by its Arts Commission

      By: _____
          Executive Director

      ARTIST:

      _____
                 (Name)

      _____
              (Signature)

      ATTEST:

      _____, Clerk

      By: _____
          Deputy Clerk

CORPORATE SEAL:

_____
Witness

Approved as to form and legal sufficiency:

_____